1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

GUSTAVO VARGAS RAMIREZ,

11

Plaintiff,

12

v.

13

UNITED STATES OF AMERICA,

14

Defendant.

CASE NO. C13-2325JLR

ORDER ON MOTION TO
DISMISS OR FOR SUMMARY
JUDGMENT

15

## I.   INTRODUCTION

16

Before the court is Defendant United States of America's motion to dismiss or for

17

summary judgment.  (Mot. (Dkt. # 15).)  This is a civil rights case.  Plaintiff Gustavo

18

Vargas Ramirez was stopped by a police officer in Anacortes, Washington in June, 2011,

19

for failing to signal a left turn.  (Compl. (Dkt. # 1) ¶¶ 2, 9.)  The stop led to questioning

20

and eventually detention after the police officer who stopped Mr. Vargas began to suspect

21

that Mr. Vargas was in the United States illegally.  (*Id.* ¶¶ 2-3.)  Mr. Vargas was

22

eventually arrested by a United States Border Patrol ("USBP") agent and placed in

1   immigration detention, where he remained for over two months. (*Id.* ¶ 6.) After he was

2   released, Mr. Vargas filed this complaint against the United States, alleging claims for

3   false arrest, false imprisonment, negligent and intentional infliction of emotional distress,

4   and abuse of process. (*Id.* ¶¶ 78-123.) He claims that (1) his detention was illegal

5   because the detaining officers did not have a reasonable suspicion that he was in the

6   country illegally; and (2) his eventual arrest was illegal because the arresting officers did

7   not have probable cause that he was in the country illegally. (*See generally* Compl.) The

8   court has examined the complaint, the documents attached thereto, the submissions of the

9   parties, and the governing law, and concludes that the record is not sufficiently developed

10  for the court to determine as a matter of law if reasonable suspicion and probable cause

11  were present at the relevant times. Accordingly, the court DENIES the United States'

12  motion.

13              **II.   BACKGROUND[1]**

14       On June 23, 2011, at around 9:00 P.M., Mr. Vargas was stopped by a police

15  officer for failing to signal a left hand turn. (*Id.* ¶ 9.) At the time of the stop, Mr. Vargas

16  was on his way to his art studio in Anacortes, Washington. (*Id.*) The police officer who

17  stopped Mr. Vargas was Officer R.W. Leetz of the Anacortes Police Department. (*Id.*)

18  Officer Leetz asked to see Mr. Vargas' driver's license, proof of insurance, and

19

20       [1] The parties do not dispute many of the basic historical facts underlying this case for
21  purposes of this motion. (Mot. at 2.) For many of these facts, Defendant accepts the allegations
    in Plaintiff's complaint as true as is required on a motion under Federal Rule of Civil Procedure
22  12(b)(6). (*See id.* (citing *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009)).)

1    automobile registration.  (*Id.* ¶ 11.)  Mr. Vargas provided these documents, and Officer

2    Leetz took them to his patrol car.  (*Id.*)

3         Upon investigating these documents, Officer Leetz noticed that Mr. Vargas'

4    driver's license had a social security number of "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" associated with it.  (*Id.*

5    ¶ 12.)  In Washington, drivers may obtain a driver's license without providing a social

6    security number as long as they present adequate proof of state residence.  (*Id.* ¶ 13

7    (citing RCW § 46.20.091; WAC § 308-104-014(4)).)  Nevertheless, Officer Leetz found

8    this suspicious and contacted USBP to inquire about Mr. Vargas' immigration status.  (*Id.*

9    ¶ 14.)

10        USBP began looking into the matter.  In the meantime, Officer Leetz continued

11   processing the traffic stop.  (*Id.* ¶¶ 16-17.)  Before he finished, the USBP agent called

12   back and informed Mr. Leetz that USBP had searched several databases and had found

13   no information regarding Mr. Vargas' immigration status or criminal history.  (*Id.* ¶ 17.)

14   A USBP agent then spoke with Mr. Vargas on the phone, asking him questions about his

15   immigration status.  (*Id.* ¶¶ 18-24.)  Mr. Vargas responded that he did not want to answer

16   any questions without speaking to a lawyer.  (*Id.* ¶ 23.)

17        The USBP agent then asked Officer Leetz to detain Mr. Vargas.  (*Id.* ¶ 27.)  The

18   agent told Officer Leetz that a USBP agent would meet Officer Leetz at the Anacortes

19   Police Station.  (*Id.*)  Accordingly, Officer Leetz returned to Mr. Vargas' car, directed

20   Mr. Vargas to step out of his vehicle, and informed him that he was being detained at

21   USBP's request.  (*Id.* ¶ 28.)  Mr. Vargas exited his car, and Officer Leetz handcuffed

22

1  him, patted him down for weapons, and placed him in the back of his patrol car. (*Id.*

2  ¶ 29.)

3      The two men then proceeded to the Anacortes Police Station. (*Id.* ¶ 31.) Once

4  there, Officer Leetz locked Mr. Vargas in a "very cold" holding cell for about 40 minutes

5  until a USBP agent arrived. (*Id.*)  Mr. Vargas claims he was not permitted to wear shoes

6  in the cell and was denied access to a blanket. (*Id.* ¶¶ 32-33.) Mr. Vargas was permitted

7  to make a telephone call but was not permitted to speak in Spanish during that call;

8  Officer Leetz allegedly "barked" "No Spanish!" at Mr. Vargas when he attempted to

9  speak into the phone in Spanish. (*Id.* ¶ 34.) Mr. Vargas claims he "felt frightened and

10  distressed." (*Id.* ¶ 36.)

11      After approximately 40 minutes, USBP agent John Orr arrived on the scene. (*Id.*

12  ¶ 37.) Agent Orr entered Mr. Vargas' cell and began asking Mr. Vargas questions. (*Id.*

13  ¶ 38.) He asked Mr. Vargas where he was born, how long he had been in the United

14  States, and what his immigration status was. (*Id.*)  Mr. Vargas initially refused to answer

15  any questions without first speaking to an attorney, but Agent Orr testifies that Mr.

16  Vargas eventually relented and provided some basic information. (*Id.* ¶¶ 38-41; Orr

17  Decl. (Dkt. # 17) ¶¶ 4-5.)[2]  Mr. Vargas appears to dispute this fact. (*Id.* ¶¶ 40-43.)

18  However, Agent Orr testifies that Mr. Vargas told him he lived in Washington and had

19

20      [2] The court is not permitted to look beyond the pleadings on a Rule 12(b)(6) motion to
21  dismiss, but the United States has also moved for summary judgment. (*See* Mot.)  Thus, the
   facts contained in Agent Orr's declaration and in similar declarations may be considered for
22  purposes of the United States' summary judgment motion, but not for purposes of its Rule
   12(b)(6) motion.

ORDER- 4

1   lived there for about 10 years but was born in Mexico.  (Orr Decl. ¶¶ 4-5.)  Mr. Vargas

2   alleges that he felt "caged and outnumbered" because Agent Orr's questions were

3   "aggressive and unrelenting" and that he "did not believe he had the choice to stay

4   silent." (Compl. ¶ 41.)  Nevertheless, Mr. Vargas alleges that he "remained

5   unresponsive" throughout this questioning.  (*Id.* ¶ 43.)  Agent Orr testifies that he then

6   asked Mr. Vargas about his immigration status, but that Mr. Vargas refused to answer

7   any more questions without an attorney present.  (Orr Decl. ¶ 5.)

8       Mr. Vargas was then taken to the Bellingham Border Patrol Station in Bellingham,

9   Washington.  (Compl. ¶ 42.)  Agent Orr believed that it was necessary to fingerprint Mr.

10  Vargas and run his fingerprints through a database called "IDENT" that would determine

11  if Mr. Vargas had valid immigration status or prior criminal history.  (Orr Decl. ¶ 7.)  The

12  closest IDENT machine was at the Bellingham Border Patrol Station, so Mr. Vargas was

13  taken there.  (*Id.*)  Mr. Vargas was held overnight in Bellingham.  (Compl. ¶ 42.)  USBP

14  agents ran Mr. Vargas' fingerprints through the IDENT machine and found no criminal

15  or immigration records associated with them.  (*Id.* ¶ 43.)

16      Mr. Vargas was eventually arrested and placed in immigration detention.  USBP

17  agents served Mr. Vargas with a "Form I-213" arrest record and a "Form I-862" charging

18  document.  (*Id.* ¶ 45.)  He was handcuffed, shackled, and transported to the Northwest

19  Immigration Detention Center in Tacoma, Washington.  (*Id.* ¶ 47.)  Once there, he was

20  transferred to the custody of Immigration and Customs Enforcement ("ICE"), which

21  instituted removal proceedings against him.  (*Id.*)  Mr. Vargas remained in immigration

22

1    detention for approximately 10 weeks until he was permitted to post bond. (*Id.* ¶ 48.) On

2    February 6, 2013, his removal proceedings were administratively closed. (*Id.* ¶ 49.)

3        On December 27, 2013, Mr. Vargas brought this complaint against the United

4    States. (*See* Compl.) He alleges several claims pursuant to the Federal Tort Claims Act

5    including false arrest, false imprisonment, intentional and negligent infliction of

6    emotional distress, and abuse of process. (*Id.* ¶ 78-123.) He alleges that his physical and

7    mental health worsened as a result of his arrest and imprisonment and that he lost his job

8    and sustained other economic and professional harm as well. (*Id.* ¶¶ 53-58.) He also

9    alleges that USBP agents intentionally fabricated information contained in his Form I-

10   213. (*Id.* ¶¶ 59-77.)

11       Five months later, the United States brought this motion to dismiss. (*See* Mot.) In

12   the motion, the United States argues that Mr. Vargas' arrest was lawful and that,

13   accordingly, Mr. Vargas's tort claims should be dismissed. (*Id.*) The United States

14   brought the motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

15   or, in the alternative, as a motion for summary judgment.

16   **III.    ANALYSIS**

17   **A.    Applicable Legal Standards**

18       This is not, strictly speaking, a Rule 12(b)(6) motion to dismiss. A Rule 12(b)(6)

19   motion may not be filed after an answer is filed, *see* Fed. R. Civ. P. 12(b), and the United

20   States filed this motion more than two months after it filed its answer (*see* Dkt. ## 14,

21   15). Accordingly, it is proper to construe the United States' motion not as a Rule

22

1  12(b)(6) motion, but as a motion for judgment on the pleadings.  *See Elvig v. Calvin*

2  *Presbyterian Church*, 375 F.3d 951, 954-55 (9th Cir. 2004).

3      Motions for judgment on the pleadings are governed by Federal Rule of Civil

4  Procedure 12(c).  Under that rule, the court "must accept all factual allegations in the

5  complaint as true and construe them in the light most favorable to the non-moving party."

6  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citation omitted); *see Yakima*

7  *Valley Mem'l Hosp. v. Wash. State Dept. of Health*, 654 F.3d 919, 925 (9th Cir. 2011)

8  (court "assume[s] the facts alleged in the complaint are true").  "Judgment on the

9  pleadings is properly granted when there is no issue of material fact in dispute, and the

10  moving party is entitled to judgment as a matter of law."  *Id.*; *see Lyon v. Chase Bank*

11  *USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011).

12      Here, the court applies the same standard as it would on a Rule 12(b)(6) motion.

13  Indeed, any time a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after

14  an answer has been filed, or when it is functionally equivalent to a motion to dismiss for

15  failure to state a claim, the same standard applies to both.  *Dworkin v. Hustler Magazine*

16  *Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *see Seabright Ins. Co. v. Matson Terminals,*

17  *Inc.*, 828 F. Supp. 2d 1177 (D. Haw. 2011) (motions differ in time of filing but are

18  otherwise functionally identical and require same standard of review).  Thus, dismissal

19  for failure to state a claim "is proper if there is a 'lack of a cognizable legal theory or the

20  absence of sufficient facts alleged under a cognizable legal theory.'"  *Conservation Force*

21  *v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police*

22  *Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

1    The United States also presents its motion, in the alternative, as a motion for

2    summary judgment.  (*See* Mot.)  There are several facts at issue in this motion that are

3    not alleged in Mr. Vargas' complaint.  As such, the United States has submitted a handful

4    of declarations establishing facts outside the pleadings on which it would have the court

5    rely.  (*See, e.g.*, Orr Decl. (Dkt. # 17) ¶¶ 4-5.)  If the court relies on these facts, the

6    motion must be treated as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(b)(6);

7    Fed. R. Civ. P. 56.

8        Summary judgment is appropriate if the evidence, when viewed in the light most

9    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

10    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

11    P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

12    477 F.3d 652, 658 (9th Cir. 2007).  The court is "required to view the facts and draw

13    reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v.*

14    *Harris*, 550 U.S. 372, 378 (2007).  The moving party bears the initial burden of showing

15    there is no genuine issue of material fact and that he or she is entitled to prevail as a

16    matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

17    non-moving party "must make a showing sufficient to establish a genuine dispute of

18    material fact regarding the existence of the essential elements of his case that he must

19    prove at trial."  *Galen*, 477 F.3d at 658.

20    **B.   Motion to Strike**

21        As a preliminary matter, the court GRANTS a motion to strike contained in Mr.

22    Vargas' surreply.  Mr. Vargas moves to strike certain arguments that the United States

1 raises for the first time in its reply brief.  (Surreply (Dkt. # 23).)  As a general matter, a

2 district court need not consider arguments raised for the first time in a reply brief.

3 *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d

4 1039, 1048 (9th Cir. 2003)).  The reason for this is that parties should be given an

5 opportunity to respond to opposing arguments whenever possible.  After a reply brief is

6 filed, the non-moving party does not have an additional opportunity to rebut newly-raised

7 arguments, to present contrary authority or evidence, or to otherwise explain why the

8 moving party's newly-raised arguments should be rejected.  It is for this reason that this

9 court has held that "[a]rguments cannot be properly raised for the first time on reply."

10 *See, e.g.*, *Hampton v. Allstate Corp.*, No. C13-0541JLR, 2013 WL 6000040, at *6 (W.D.

11 Wash. Nov. 12, 2013) (citing *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1171

12 (W.D. Wash. 2010)).

13        Here, it would be unfair to consider the United States' newly-raised arguments at

14 this time.  In its reply brief, the United States does not merely respond to Mr. Vargas'

15 arguments or introduce new, but related, lines of reasoning in support of its position.

16 (*See* Reply (Dkt. # 21).)  Instead, the United States seeks to reframe its motion as an

17 entirely different motion.  (*See id.*)  In this regard, the United States asserts that it "cited

18 Rule 12(b)(6), but should have brought its motion under Rule 12(b)(1)."  (*Id.* at 1.)  In

19 other words, the United States seeks to transform its failure to state a claim/summary

20 judgment motion into a motion to dismiss for lack of subject matter jurisdiction.

21 Moreover, the United States raises a "factual" challenge to the court's subject matter

22 jurisdiction, which permits the court to go outside the pleadings and find jurisdictional

1   facts.  (*See id.* at 1-3); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

2   2004).  This is an entirely different kind of motion than the United States' original

3   motion, and relies on arguments that are different both in kind and in substance from

4   anything raised in the original motion.  The United States would have the court pass on

5   the merits of these arguments without hearing any opposition or response from Mr.

6   Vargas.  This would be unfair.  Accordingly, the court exercises its discretion to ignore

7   arguments raised for the first time in a reply brief, but without prejudice to re-raising

8   those arguments at another time in a separate, procedurally appropriate motion.  *See*

9   *Zamani*, 491 F.3d at 997.

10  **C.    Issues to be Addressed**

11          The United States nominally moves for dismissal/summary judgment with respect

12  to all of Mr. Vargas' claims.  (*See* Mot. at 1-2.)

13          However, a careful examination of the United States' motion and response reveals

14  that it has only addressed one aspect of Mr. Vargas' claims in sufficient detail to warrant

15  the court's consideration.  In its motion, the United States focuses its efforts on

16  demonstrating that Mr. Vargas' arrest was lawful.  (*See generally id.*)  The United States

17  seeks to do this by showing that the USBP agents involved in the arrest were justified by

18  reasonable suspicion and probable cause to detain and arrest Mr. Vargas.  (*See id.* at 6-19

19  (reasonable suspicion to detain), 19-23 (probable cause to arrest).)  But Mr. Vargas'

20  complaint alleges more than just unlawful arrest.  Mr. Vargas also brings several claims

21  that are premised on other conduct.  (Compl. ¶¶ 99-123.)  Specifically, he brings claims

22  for negligent and intentional infliction of emotional distress, and for abuse of process

1   premised on (1) unlawful arrest; (2) "intimidating tactics" during interrogation; and (3)

2   USBP's allegedly falsified I-213 form which contained patently false statements of fact.

3   (*Id.*)

4          The United States does not address these allegations at all in its motion—at least

5   not in sufficient detail to justify dismissing the claims.  (*See* Mot.)  In some cases, the

6   United States raises new arguments in its reply brief for why certain allegations do not

7   state a claim.  (*See, e.g.*, Reply at 9-11.)  For example, in its reply brief, the United States

8   raises a completely new argument related to abuse of process.  (*See id.*)  However, as

9   discussed above, it is not fair to consider this argument without giving Mr. Vargas an

10  opportunity to respond.  *See Zamani*, 491 F.3d at 997.

11         Accordingly, the court rejects the United States' argument that it should dismiss

12  claims not based on unlawful arrest.  The United States has not met its burden of

13  demonstrating a basis for either Rule 12 dismissal or summary judgment on Mr. Vargas'

14  infliction of emotional distress and abuse of process claims to the extent those claims are

15  based on "intimidating tactics" during interrogation and USBP's falsified I-213 form.

16  (*See* Compl. ¶¶ 99-123.)

17  **D.    Framework for Analyzing Unlawful Arrest**

18         With these preliminary issues decided, the court's primary task in deciding this

19  motion is to determine whether Mr. Vargas' arrest was lawful.  If so, Rule 12 dismissal

20  and/or summary judgment is appropriate with respect to Mr. Vargas' claims for false

21  arrest, false imprisonment, and infliction of emotional distress—to the extent the

22  emotional distress claims are premised on unlawful arrest.  If not, dismissal is not

1    appropriate.  In other words, these causes of action rise or fall with the lawfulness of Mr.

2    Vargas' arrest.  *See, e.g.*, *Hanson v. City of Snohomish*, 852 P.2d 295, 301 (Wash. 1993)

3    (lawful arrest is a complete defense to unlawful imprisonment or false arrest); *Conrad v.*

4    *United States*, 447 F.3d 760, 767 (9th Cir. 2006) (noting that federal court must apply

5    state law in assessing tort liability under the FTCA).

6          The lawfulness of Mr. Vargas' arrest must be examined in light of USBP agents'

7    authority to act, which is set forth in relevant part in 8 U.S.C. § 1357.  Under that statute,

8    entitled "Powers of immigration officers and employees," USBP agents may, without a

9    warrant,

10          (1) . . . interrogate any alien or person believed to be an alien as to his right
            to be or to remain in the United States; [and] (2) . . . arrest any alien in the

11          United States, if he has reason to believe that the alien so arrested is in the
            United States in violation of any such law or regulation and is likely to

12          escape before a warrant can be obtained for his arrest.

13    8 U.S.C. § 1357(a)(1)-(2).  Federal regulations expand on this authority, and in particular

14    8 C.F.R. § 287.8, which permits immigration officers to "briefly detain" a suspected

15    undocumented immigrant "for questioning" if the officer has "reasonable suspicion,

16    based on specific articulable facts, that the person being questioned is . . . an alien

17    illegally in the United States . . . ."  8 C.F.R. § 287.8(b)(2).  That same regulation permits

18    immigration officers to make arrests, although an arrest can be made only if "the

19    designated immigration officer has reason to believe that the person to be arrested . . . is

20    an alien illegally in the United States."  8 C.F.R. § 287.8(c)(2).  This requirement is

21    tantamount to a constitutional "probable cause" requirement.  *See, e.g.*, *Tejada-Mata v.*

22    *I.N.S.*, 626 F.2d 721, 725 (9th Cir. 1980).

ORDER- 12

1    Thus, a USBP agent's authority to detain and arrest suspected illegal aliens

2  depends on familiar Fourth Amendment concepts of reasonable suspicion and probable

3  cause, respectively.  Under the Fourth Amendment, police stops fall into three categories.

4  *Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993).  First, a police officer may

5  stop a person for questioning so long as the person is free to leave at any time.  *Id.*

6  Second, a police officer may "seize" a person for a brief, investigatory stop.  *Id.*  A

7  seizure takes place when a "police officer accosts an individual and restrains his freedom

8  to walk away."  *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  Such stops must be supported by a

9  "reasonable suspicion to believe that criminal activity 'may be afoot.'"  *United States v.*

10 *Arvizu*, 534 U.S. 266, 273 (2002).  Finally, the police may make a full-scale arrest, which

11 must be supported by probable cause.  *Morgan*, 997 F.2d at 1252 (citing *Adams v.*

12 *Williams*, 407 U.S. 143, 148-49 (1972)).

13    When determining whether reasonable suspicion exists, a court "must look at the

14 'totality of the circumstances' of each case to see whether the detaining officer has a

15 'particularized and objective basis' for suspecting legal wrongdoing."  *Arvizu*, 534 U.S.

16 at 273.  The "totality of the circumstances" approach assures that court do not "engage in

17 a 'sort of divide-and-conquer analysis' by evaluating and rejecting each factor in

18 isolation."  *United States v. Cheromiah*, 455 F.3d 1216, 1221 (9th Cir. 2006).  "This

19 process allows officers to draw on their own experience and specialized training to make

20 inferences from and deductions about the cumulative information available to them that

21 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273

22

1    (2002).  "Reasonable suspicion" falls short of "probable cause," and also falls

2    "considerably short of satisfying a preponderance of the evidence standard."  *Id.* at 274.

3        The concept of reasonable suspicion is somewhat abstract, and is not a "finely-

4    tuned standard."  *Id.*  The United States Supreme Court has "deliberately avoided

5    reducing it to a neat set of legal rules."  *Id.* (internal marks omitted).  However, it is also

6    clear that "reasonable suspicion may not be based on broad profiles which cast suspicion

7    on entire categories of people without any individualized suspicion of the particular

8    person to be stopped."  *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th

9    Cir. 2002) (internal quotations omitted).  Likewise, an "individual's presence in an area

10   of expected criminal activity, standing alone, is not enough to support a reasonable,

11   particularized suspicion that the person is committing a crime."  *Illinois v. Wardlow*, 528

12   U.S. 119, 124 (2000) (citing *Brown v. Texas*, 443 U.S. 47 (1979)).  Finally, an officer's

13   reliance on a mere "hunch" is insufficient to justify an investigative detention.  *Arvizu*,

14   534 U.S. at 274.

15       Probable cause is a more demanding standard than reasonable suspicion.  *Id.* at

16   123.  Probable cause exists if "under the totality of circumstances known to the arresting

17   officers, a prudent person would have concluded that there was a fair probability that [the

18   defendant] had committed a crime."  *Jackson v. City of Seattle*, NO. C05-2034 JLR, 2006

19   WL 30000953, at *2 (W.D. Wash. Oct. 20, 2006) (quoting *Grant v. City of Long Beach*,

20   315 F.3d 1081, 1085 (9th Cir. 2002)).  Stated another way, probable cause to arrest exists

21   when the officer has knowledge or reasonably trustworthy information sufficient to lead a

22   person of reasonable caution to believe that an offense has been or is being committed.

1   *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Probable cause is an objective standard.  *United*

2   *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  However, although in some

3   instances there may initially be probable cause justifying an arrest, when additional

4   information obtained at the scene indicates that "there is less than a fair probability that

5   the defendant has committed or is committing a crime . . . [the] execution of the arrest or

6   continuation of the arrest is illegal." *Id.* at 1073 (citing *United States v. Ortiz-Hernandez*,

7   427 F.3d 567, 574 (9th Cir. 2005).

8   **E.    Unknown Facts**

9           Both of Mr. Vargas' motions—for Rule 12 dismissal and for summary

10  judgment—are premature.  The court has examined the record in great detail, has

11  thoroughly reviewed the controlling law and the briefing of the parties, and has heard oral

12  argument.  Having done all this, the court is led to the inescapable conclusion that the

13  factual record is not yet sufficiently developed to permit a conclusion that the United

14  States is entitled to judgment as a matter of law.  In short, there are too many disputed

15  and unknown facts for the court to conclude that, as a matter of law, the USBP officers

16  involved in Mr. Vargas' detention had reasonable suspicion to order that he be detained

17  and probable cause to arrest him.  If the historical facts underlying a case are undisputed,

18  reasonable suspicion and probable cause can be decided as a matter of law.  *Tsao v.*

19  *Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012); *cf. Haywood v. City of Twisp*,

20  No. CV-06-355-EFS, 2008 WL 2468435, at *3 (E.D. Wash. June 17, 2008).  However, if

21  there is a genuine dispute, or simply a lack of information and allegations, with respect to

22  a fact that is material to reasonable suspicion or probable cause, it cannot be determined

1   whether one party is entitled to judgment as a matter of law on these issues. *See, e.g.*,

2   *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991); *Burdett v. Reynoso*, No. C-06-

3   00720 JCS, 2007 WL 2429426, at *20 (N.D. Cal. Aug. 23, 2007).  As explained below,

4   that is the situation here.

5        To begin, with regard to reasonable suspicion, it is helpful to understand exactly

6   what is known.  It is known that Mr. Vargas is Hispanic and was found in Anacortes, and

7   that Officer Leetz discovered that Mr. Vargas' driver's license had a social security

8   number of "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" associated with it.  (Compl. ¶ 12.)  It is also known that USBP

9   ran Mr. Vargas' name through several of its databases and found no criminal or

10  immigration records.  (*Id.* ¶ 17.)  It is known that a USBP agent spoke with Mr. Vargas

11  on the phone and asked him some questions, but that Mr. Vargas refused to cooperate

12  without first speaking to a lawyer.  (*Id.* ¶¶ 18-24.)  It is known that, at that point, the

13  USBP agent asked Officer Leetz to detain Mr. Vargas, and Officer Leetz did so.  (*Id.*

14  ¶ 27.)  It is at this point that the court is asked to evaluate reasonable suspicion.  In

15  particular, the court is asked to examine whether USBP had reasonable suspicion to

16  request that Officer Leetz detain Mr. Vargas.[3]

17       Clearly, the reasonable suspicion inquiry is not clear-cut based on these facts,

18  leading the court to focus on what is not known vis-à-vis reasonable suspicion.  There are

19

20       [3] Officer Leetz is not a party to this action, so it is not relevant what he knew, suspected,
21  or believed about Mr. Vargas except to the extent that Officer Leetz communicated that
    information to a USBP agent.  Likewise, it is not relevant what Officer Leetz did or did not do
22  after the USBP agent's request to detain Mr. Vargas except to the extent the USBP agent
    suggested a certain form or manner of detention was preferable or required.

1  a lot of important facts that are not known.  For example, the court does not know exactly

2  what a search for Mr. Vargas' name in the USBP databases would have or could have

3  revealed, but instead has only broad descriptions of the contents of those databases.  (*See*

4  Mot. at 12.)  Thus, the court is left to speculate about the precise import of the database

5  search.  The court also does not know how good or bad Mr. Vargas' command of the

6  English language was on that day or in general.  (*Compare* Leetz Report at 3 (Dkt. # 1-1)

7  *and* Orr Decl. ¶ 6 *with* Compl. ¶¶ 10, 23.)  The parties appear to disagree somewhat on

8  this fact.  (*Id.*)  Perhaps more importantly, the court does not know whether, or what,

9  Officer Leetz ever communicated to the USBP agent about Mr. Vargas' ability to speak

10  English.  (*See* Leetz Report at 3.)  Along these same lines, the court does not know

11  whether Officer Leetz communicated anything at all to the USBP agent about Mr.

12  Vargas' demeanor, his appearance, the fact that he is Hispanic, or anything else that

13  might conceivably bear on the question of reasonable suspicion.  (*See id.*)  Further, the

14  court does not know what questions the USBP agent asked Mr. Vargas over the phone or

15  whether he answered any of them at all before refusing to cooperate.  (*See id.*; Compl.

16  ¶¶ 20-24.)  Last, and also important, the court does not know what the USBP agent said

17  to Officer Leetz when he requested that Officer Leetz detain Mr. Vargas.  (*See* Leetz

18  Report at 3.)  Specifically, the court does not know whether the USBP agent suggested

19  any form or manner of detention, whether he asked Officer Leetz to use handcuffs or

20  place Mr. Vargas in a cell, whether he requested that Mr. Vargas be transported—either

21  assisted or unassisted—to the Anacortes Police Station, or whether he suggested that Mr.

22  Vargas was free to leave or insisted he be put in the back of Officer Leetz' patrol car.

1   (*See id.*)  These facts are simply not in the record or in Mr. Vargas' complaint.  (*See*

2   Compl. ¶¶ 25-29.)  These facts all relate directly to the question of reasonable suspicion

3   and also to the question of whether reasonable suspicion or probable cause is the correct

4   analysis at this point.  *See Arvizu*, 534 U.S. at 273; (Mot. at 8 (citing *United States v.*

5   *Bravo*, 295 F.3d 1002, 1010 (9th Cir. 2002); *United States v. Guzman-Padilla*, 573 F.3d

6   865, 884-85 (9th Cir. 2009)).)

7          There are similar problems with respect to probable cause.  It is known that Mr.

8   Vargas was taken to the Anacortes Police Station and had to wait approximately 40

9   minutes before Agent Orr arrived.  (Compl. ¶¶ 31-36.)  It is known that Agent Orr asked

10  Mr. Vargas some questions and, at some point, Mr. Vargas refused to cooperate without

11  first speaking to a lawyer.  (Compl. ¶¶ 37-41; Orr Decl. ¶ 5.)  However, the court is

12  without information or allegation regarding the specific questions Mr. Vargas allegedly

13  answered or the specific answers, if any, that he gave.  (Compl. ¶¶ 37-41; Orr Decl. ¶ 5.)

14  Most importantly for probable cause, the court does not know at this time whether Mr.

15  Vargas revealed to Agent Orr that he was born in Mexico.  Agent Orr testifies that Mr.

16  Vargas revealed this information.  (Orr Decl. ¶ 5.)  However, Mr. Vargas alleges that he

17  did not.  (Compl. ¶¶ 39, 43.)  At oral argument, counsel for Mr. Vargas represented that

18  Mr. Vargas contests this fact and has previously contested this fact in other court

19  proceedings.  As such, the court does not know, and cannot assume on this motion, that

20  Mr. Vargas revealed to Agent Orr that he was born in Mexico.  *See Fleming*, 581 F.3d at

21  925; *Scott*, 550 U.S. at 378.  This fact is critical to the determination of probable cause,

22  and without it, the court cannot make a fair and accurate assessment of how the law

ORDER- 18

1  applies to Mr. Vargas.  *See United States v. Quintana*, 623 F.3d 1237, 1240-41 (8th Cir.

2  2010).

3         Without all of these facts, the court is unable to assess the totality of the

4  circumstances surrounding Mr. Vargas' detention and/or arrest.  This is critical to a

5  reasonable suspicion analysis, where the court "must look at the 'totality of the

6  circumstances' of each case to see whether the detaining officer has a 'particularized and

7  objective basis' for suspecting legal wrongdoing."  *Arvizu*, 534 U.S. at 273.  It is also

8  critical to any probable cause analysis, where the court must determine whether "under

9  the totality of circumstances known to the arresting officers, a prudent person would have

10  concluded that there was a fair probability that [the defendant] had committed a crime."

11  *Jackson*, 2006 WL 30000953, at *2.  Without full knowledge of all the pertinent facts,

12  the court cannot properly conduct its analysis.

13         To summarize, there are simply too many unknown or disputed facts both within

14  and beyond the pleadings that are critical to the court's determination of reasonable

15  suspicion and probable cause.  As such, the court concludes that a more developed record

16  is necessary before these questions can be answered.  To prevail on either a motion for

17  summary judgment or a Rule 12 motion to dismiss, the moving party must be able to

18  demonstrate entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 12, 56;

19  *Celotex*, 477 U.S. at 322; *Galen*, 477 F.3d at 658; *Lyon*, 656 F.3d at 883.  Here, there is

20  too much missing information for the court to conclude that the United States has met its

21  burden of showing it is entitled to judgment as a matter of law on reasonable suspicion or

22  probable cause.  Without the benefit of discovery, the court simply does not have all the

ORDER- 19

1  facts it needs.  Accordingly, the United States' motion is DENIED, but without prejudice

2  to filing similar motions once the record is more fully developed.

3                              **IV.    CONCLUSION**

4           For the foregoing reasons, the court DENIES the United States' motion to dismiss

5  (Dkt. # 15).

6           Dated this 23rd day of July, 2014.

7

8

9           _____

10          JAMES L. ROBART
            United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22