UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GUSTAVO VARGAS RAMIREZ,

             Plaintiff,

        v.

UNITED STATES OF AMERICA,

             Defendant.

CASE NO. C13-2325JLR

ORDER ON CROSS MOTIONS
FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

This matter comes before the court on Defendant United States of America's ("United States") motion for summary judgment (Def. Mot. (Dkt. # 34) (sealed), (Dkt. # 37 (redacted)) and Plaintiff Gustavo Vargas Ramirez's ("Mr. Vargas") motion for partial summary judgment (Plf. Mot. (Dkt. # 44)). Having considered the submissions of the parties, the balance of the record, and the relevant law, and having heard oral argument, the court grants in part and denies in part both motions.

//

ORDER- 1

## II.    BACKGROUND

Unless otherwise noted, the following facts are undisputed.  At approximately 9:00 p.m. on June 23, 2011, Officer Leetz of the Anacortes Police Department pulled Mr. Vargas over in Anacortes, Washington, for failing to signal a left turn.  (Aldana Decl. (Dkt. # 36) Ex. 1 ("Leetz Dep.") at 7:20-22; Aldana Decl. USAO000283-288 ("Leetz Rep").)  Officer Leetz states that he had difficulty communicating with Mr. Vargas in English at the scene of the traffic stop.  (Leetz Dep. at 8:1-4; 26:20-27:7; Leetz Rep.)  Nonetheless, Officer Leetz was able to obtain Mr. Vargas' driver's license, registration, and insurance.  (Leetz Dep. at 8:1-4; 22:7-23; Leetz Rep.)

While processing Mr. Vargas' documents, Officer Leetz noticed that the Washington Department of Licensing database showed Mr. Vargas' Social Security number as all zeros.  (Leetz Dep. at 8:5-14; Leetz Rep.)  Officer Leetz was unaware that Washington State drivers are not required to provide a Social Security number in order to qualify for a license.  (Leetz Dep. at 8:17-22.)  Officer Leetz then called the United States Border Patrol ("Border Patrol").  (Leetz Dep. at 37:11-25; Leetz Rep.)  Officer Leetz identifies two reasons he contacted Border Patrol:  (1) he suspected Mr. Vargas' presence in the United States was not lawful because Mr. Vargas was not conversant in English and because the database did not identify Mr. Vargas' Social Security number, and (2) he

//

//

//

//

1    hoped that a Border Patrol agent who spoke Spanish could explain to Mr. Vargas how to

2    comply with the ticket.[1]  (Leetz Dep. at 9:1-7; 24:15-17; 29:16-30:5; 41:4-8.)

3          Officer Leetz reached Agent Hafstadt at the Border Patrol station in Bellingham,

4    Washington.  (Hafstadt Dep. at 10:23-11:6.)  Officer Leetz informed Agent Hafstadt that

5    he suspected Mr. Vargas was illegally present in the United States.  (Leetz Dep. at 10:4-

6    14; Leetz Rep.)  It is undisputed that Officer Leetz provided Agent Hafstadt with Mr.

7    Vargas' name and date of birth, as well as the facts that there was no Social Security

8    number associated with Mr. Vargas' driver's license and that he was not conversant in

9    English.  (Leetz Dep. at 8:5-9:7; 38:24-39:23; Hafstadt Dep. at 12:9-17.)  There is

10   inconsistent testimony as to whether Officer Leetz provided Agent Hafstadt with

11   information regarding Mr. Vargas' apparent ethnicity.  (Leetz Dep. at 9:16-21, 10:1-3,

12   39:24-40:12; 84:3-23; Hafstadt Dep. at 12:7-17.)

13         Officer Leetz informed Agent Hafstadt that he could not detain Mr. Vargas any

14   longer than it took him to finish processing the traffic infraction unless specifically

15   requested to do so by Border Patrol.  (Leetz Dep. at 9:9-15, 10:4-11; Leetz Rep.)

16   Because he believed that enforcing immigration laws was beyond his purview, Officer

17   Leetz intended to release Mr. Vargas without further questions unless Agent Hafstadt

18   called him back.  (Leetz Dep. at 10:12-14; 24:1-2; 88:15-24.)

19

20   ───────────────

21         [1] At the time, it was the occasional practice of Anacortes police officers to call Border Patrol to request translation assistance, in part because Border Patrol provided a faster and less expensive alternative to other translation services.  (Leetz Dep. at 29:21-30:15.)  That practice has since been discontinued.  (*Id.* at 79:2-80:14; Aldana Decl. Ex. 3 ("Hafstadt Dep.") at 45:4-13, Ex. 6 ("Reyes Dep.")

22   at 50:3-9.)

1        Agent Hafstadt proceeded to run Mr. Vargas' information through a series of

2 databases, none of which returned any records, with the exception of a record indicating

3 that Mr. Vargas possessed a driver's license.  (Hafstadt Dep. at 12:24-13:4; 15:19-19:2.)

4 Overall, the results of the search showed that Mr. Vargas (1) did not have any warrants

5 against him, (2) did not have a state or federal criminal history, (3) was not registered as

6 inspected or admitted to the United States while travelling, (4) had not previously been

7 deported, (4) had not had any sort of interaction with the immigration system, (5) had not

8 been issued an employment authorization card, (6) did not have an immigration case

9 pending, (7) had not filed an application for lawful status, (8) had not entered the United

10 States at a port of entry, and (9) had not previously been arrested by immigration

11 authorities.  (*Id.* at 15:19-19:3.)

12        After running the background checks, Agent Hafstadt called Officer Leetz back

13 and informed him that he had no documentation of Mr. Vargas legally entering or

14 residing in the country.  (Leetz Dep. at 11:20-12:3.)  When Officer Leetz asked whether

15 he should detain or release Mr. Vargas, Agent Hafstadt asked to speak to Mr. Vargas.

16 (*Id.* at 12:4-6.)  Officer Leetz switched his cell phone to speakerphone and held the phone

17 through the window of Mr. Vargas' vehicle.  (*Id.* at 12:10-24.)  Agent Hafstadt does not

18 recall speaking with Mr. Vargas.  (Hafstadt Dep. at 33:17-34:8.)  Mr. Vargas recalls that

19 Agent Hafstadt asked him in English for his name, how long he had been in the United

20 States, and whether he had any documentation authorizing his presence in the country.

21 (Vargas Dep. (Dkt. # 44-2) at 49:10-50:18.)  Mr. Vargas responded in English that he

22

ORDER- 4

1   would not answer any questions without a lawyer.  (*Id.* at 50:6-15; Leetz Dep. at 13:2-12;

2   49:6-50:10.)

3       At that point, Officer Leetz pulled the phone back and resumed talking with Agent

4   Hafstadt.  (Leetz Dep. at 49:20-50:10; Vargas Dep. at 50:19-23.)  Officer Leetz asked

5   whether the agent wanted him to detain or release Mr. Vargas.  (Leetz Dep. at 55:11-14.)

6   Agent Hafstadt instructed Officer Leetz to detain Mr. Vargas and transport him to the

7   Anacortes Police Department.  (*Id.* at 13:13-14:10, 55:11-14; Leetz Rep.)  Officer Leetz

8   recalls that Agent Hafstadt asked him to "[h]old on to him for us."  (Leetz Dep. at 55:14-

9   23.)  Officer Leetz recalls that Agent Hafstadt told him that a Border Patrol agent would

10  come down from Bellingham to meet them at the Anacortes Police Department.  (*Id.* at

11  56:4-22.)  Agent Hafstadt, however, did not direct Officer Leetz how to detain Mr.

12  Vargas.  (*Id.* at 58:16-59:3.)

13      Officer Leetz believed that Agent Hafstadt, as a member of the United States

14  Border Patrol, had the legal authority to detain Mr. Vargas to investigate his immigration

15  status.  (*Id.* at 14:18-15:4; 16:4-8.)  Accordingly, Officer Leetz had Mr. Vargas exit his

16  vehicle and advised him that he was being detained at Border Patrol's request.  (*Id.* at

17  59:10-15; Leetz Rep.; Vargas Dep. at 53:9-20, 54:14-19.)  Officer Leetz then patted Mr.

18  Vargas down, placed Mr. Vargas in handcuffs, and drove him to the police station in the

19  patrol car.  (Leetz Dep. at 14:11-13; Vargas Dep. at 57:5-11; 16:9-17.)

20      The police station is located approximately one mile from the site of the traffic

21  stop.  (Leetz Dep. at 56:23-25.)  At the station, Officer Leetz placed Mr. Vargas in a

22  holding cell, removed the handcuffs, confiscated Mr. Vargas' shoes, and informed him

1  that a Border Patrol officer was on his way from Bellingham to Anacortes to interview

2  him.  (Vargas Dep. at 55:23-56:13, 57:15-17; Leetz Dep. at 16:18-17:8.)

3          In the meantime, Agent Hafstadt contacted Agent Orr, who was driving a patrol

4  car in Bellingham, and asked him to interview a person being held at the Anacortes

5  Police Department regarding his immigration status.  (Aldana Decl. Ex. 4 ("Orr Dep.") at

6  12:1-18, 13:17-19.)  Bellingham, Washington, is located approximately 40 miles from

7  Anacortes, Washington.  (*See generally* Orr Dep. at 34:1-4.)  Agent Orr arrived at the

8  Anacortes Police Department about 30 to 40 minutes after he received the call from

9  Agent Hafstadt.  (*Id.* at 17:7-14; *see also* Leetz Dep. at 67:10-14.)  At the station, Officer

10  Leetz provided Agent Orr with Mr. Vargas' driver's license and explained to Agent Orr

11  that it was difficult to communicate with Mr. Vargas in English and that Mr. Vargas'

12  Social Security number came up in the Washington Department of Licensing database as

13  all zeros.  (Orr Dep. at 18:6-16; 28:9-16.)

14          Agent Orr interviewed Mr. Vargas in an area outside the holding cell.  (Leetz Dep.

15  at 69:17-22.)  Because Agent Orr was not fluent in Spanish, the conversation took place

16  at least partly in English.[2]  (Orr Dep. at 20:25-21:11; 23:3-23; Leetz Dep. at 70:11-24.)

17  Mr. Vargas stated that at first he refused to answer any questions, but later relented

18  because he "felt scared and intimidated" and "was in a cold cell without heat and without

19  _____

20      [2] Agent Orr recalls that, because he perceived Mr. Vargas was less comfortable speaking in
English than in Spanish, the conversation took place partly in Spanish and partly in English.  (Orr Dep.
at 20:25-21:11, 23:3-23.)  Mr. Vargas, however, maintains that the entire conversation took place in

21  English.  (Vargas Dep. at 60:16-21.)   In general, the parties dispute Mr. Vargas' proficiency in the
English language.  Notwithstanding the Border Patrol agents' perceptions, Mr. Vargas testifies that he has
completed multiple "English as a second language" classes at a community college, and as a result, is able

22  to read and write in English and to converse fluently in English.  (Vargas Dep. at 6:20-8:8.)

1    shoes and I was hungry, and I thought there was no other way." (Vargas Dep. at 62:17-

2    63:1.)  During the interview, Mr. Vargas admitted that he had been borne in Mexico, that

3    he had been living in the United States for about ten years, and that he did not have any

4    immigration documents.  (Orr Dep. at 20:1-7; Vargas Dep. at 60:12-15.)  Mr. Vargas then

5    refused to answer any more questions without an attorney present.  (Orr Dep. at 25:13-20;

6    Vargas Dep. at 62:15-20.)

7            With that information, Agent Orr called Agent Hafstadt to determine whether he

8    should bring Mr. Vargas to the Border Patrol station in Bellingham to check his

9    fingerprints in the immigration databases.  (Orr Dep. at 27:5-17.)  Agent Hafstadt agreed

10   that Agent Orr should check Mr. Vargas' fingerprints, because the databases had not

11   returned any records corresponding to Mr. Vargas' name.  (*Id.*)  At that time, Agent Orr

12   placed Mr. Vargas in handcuffs and drove him to the Border Patrol station in Bellingham.

13   (*Id*. at 32:10-20; Leetz Dep. at 73:4-6.)  Agent Orr and Mr. Vargas left the Anacortes

14   police station at approximately 10:05 p.m.  (Leetz Dep. at 67:4-16.)

15          By the time they reached the Border Patrol station about 40 minutes later, Agent

16   Orr's shift was over, and the next shift of agents had arrived.  (Orr Dep. at 34:1-13.)

17   Agent Orr briefed the supervisor, Russell Wynn, and another agent, Juan Reyes,

18   regarding Mr. Vargas' detention, transferred Mr. Vargas to their supervision, and went

19   home.  (*Id.* at 34:14-20; 35:5-7.)  Agent Reyes procured Mr. Vargas' fingerprints and

20   placed him in a holding cell.  (Reyes Dep. at 11:10-16; 12:4-8.)  Mr. Vargas was held at

21   the Bellingham Border Patrol station in a cell overnight.  (Vargas Dep. at 72:1-6.)  He

22   *//*

1    recalls that the cell was cold and had no heater, that he was not permitted to wear his

2    shoes, and that the agents brought him out of the cell several times during the night in

3    order to sign documents, but did not give him enough time to read the documents.  (*Id.* at

4    69:4-72:19.)

5         That night, Agent Reyes filled out the paperwork required for the Mr. Vargas'

6    detention, including an I-213 Form.  (Reyes Dep. at 11:18-12:23, 32:4-21.)  An I-213

7    Form, titled "Record of Deportable/Inadmissible Alien," is the form that immigration

8    officers use to record the biographical information of an apprehended alien and to

9    describe the details surrounding the alien's detention.  *Hernandez-Guadarrama v.*

10   *Ashcroft*, 394 F.3d 674, 676 (9th Cir. 2005).  Agent Orr and Agent Wynn testified that, at

11   a shift change, it is customary for an on-duty agent to fill out paperwork on behalf of the

12   off-duty agent who interacted with an alien during the previous shift.  (Orr Dep. at 35:15-

13   24; Aldana Decl. Ex. 7 ("Wynn Dep.") at 11:16-12:4.)  Agent Reyes testified that he

14   relied on information relayed to him by Agent Orr and his supervisors, as well as Officer

15   Leetz's traffic citation, to fill out the form.  (Reyes Dep. at 22:16-24:13, 24:22-25:5,

16   26:8-15.)

17        The I-213 form, however, contains some incorrect information.  (*Id.* at 25:6-12.)

18   Most pertinently, the form falsely states that (1) Agent Orr was patrolling in Anacortes

19   when he received a call for translation assistance, (2) Agent Orr arrived at the scene of

20   Mr. Vargas' traffic stop, (3) Mr. Vargas admitted at the stop that he was born in Mexico,

21   and (4) Agent Orr detained and transported Mr. Vargas directly from the traffic stop to

22   the Bellingham Border Patrol station.  (Wynn Dep. at USAO000032-34 ("I-213 Form").)

1  It is undisputed that these discrepancies are incorrect; they are belied by Officer Leetz's

2  report and testimony, as well as Agent Orr's testimony.  (*See* Orr Dep. at 38:17-41:16;

3  s*ee generally* Leetz Dep.; Leetz Rep.)

4          Mr. Vargas brought five claims against the United States under the Federal Tort

5  Claims Act ("FTCA"):  (1) false arrest, (2) false imprisonment, (3) abuse of process, (4)

6  negligent infliction of emotional distress, and (5) intentional infliction of emotional

7  distress.  (*See generally* Compl. (Dkt. # 1).)  The United States has moved for summary

8  judgment on all claims, and Mr. Vargas has moved for partial summary judgment with

9  respect to liability on the false arrest, false imprisonment, and abuse of process claims.

10  (*See* Def. Mot.; Plf. Mot.)  Those motions are now before the court.

11                              **III.    ANALYSIS**

12  **A.    Summary Judgment Standard**

13          Federal Rule of Civil Procedure 56 permits a court to grant summary judgment

14  where the moving party demonstrates (1) the absence of a genuine issue of material fact

15  and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

16  317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The

17  moving party bears the initial burden of showing the absence of a genuine issue of

18  material fact.  *Celotex*, 477 U.S. at 323.

19          If the moving party does not bear the ultimate burden of persuasion at trial, it can

20  show the absence of an issue of material fact in two ways:  (1) by producing evidence

21  negating an essential element of the nonmoving party's case, or (2) by showing that the

22  nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

1    *Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving

2    party will bear the ultimate burden of persuasion at trial, it must establish a prima facie

3    showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal Plumbing, Inc.*,

4    48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that,

5    if uncontroverted at trial, would entitle it to prevail on that issue.  *Id*. at 1473.

6           If the moving party meets its burden of production, the burden then shifts to the

7    nonmoving party to identify specific facts from which a factfinder could reasonably find

8    in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby,*

9    *Inc.*, 477 U.S. 242, 252 (1986).  In determining whether the factfinder could reasonably

10   find in the nonmoving party's favor, "the court must draw all reasonable inferences in

11   favor of the nonmoving party, and it may not make credibility determinations or weigh

12   the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

13   When adjudicating cross-motions for summary judgment, a court "evaluate[s] each

14   motion separately, giving the nonmoving party in each instance the benefit of all

15   reasonable inferences."  *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 790-91

16   (9th Cir. 2006).

17        **B.     FTCA**

18          The FTCA provides for a claim against the United States for the "wrongful act or

19   omission of any employee of the Government . . . under circumstances where the United

20   States, if a private person, would be liable to the claimant in accordance with the law of

21   the place where the act . . . occurred."  28 U.S.C. § 1346(b)(1).  To state a claim within

22   the FTCA's limited waiver of sovereign immunity, a plaintiff must allege a wrongful act

1    by either (1) officers or employees of a federal agency, (2) "persons acting on behalf of a

2    federal agency in an official capacity," or (3) by a government contractor over whose

3    "day-to-day operations" the government maintains "substantial supervision."

4    *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 858 (9th Cir. 2011) (citing 28 U.S.C. § 2671

5    and *Letnes v. United States*, 820 F.2d 1517, 1519 (9th Cir. 1987)).  In assessing the

6    United States' liability under the FTCA, courts apply the law of the state in which the

7    alleged tort occurred.  *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006).

8    Accordingly, the United States' liability in this case turns on whether Agents Hafstadt,

9    Orr, Reyes, and Wynn would be liable for their interactions with Mr. Vargas under

10   Washington State law.[3]

11   **C.    False Arrest and False Imprisonment**

12            **1.  Washington false arrest and false imprisonment law**

13            Under Washington law, the "gist of an action for false arrest or false imprisonment

14   is the unlawful violation of a person's right of personal liberty or the restraint of that

15   _____

16            [3] As a member of the Anacortes Police Department, Officer Leetz is not an employee of a federal
     agency.  *See Valadez-Lopez*, 656 F.3d at 858.  Nor is he an agent over whose day-to-day operations the
17   United States exercises supervision and control.  *See id.*; *Autery v. United States*, 424 F.3d 944, 956-57
     (9th Cir. 2005); *see, e.g.*, *Means v. United States*, 176 F.3d 1376, 1377-78 (11th Cir. 1999) (finding that
18   the United States could not be held liable under the FTCA for the actions of local law enforcement
     officers that executed a federal search warrant, notwithstanding the fact that the officers had been briefed
19   the morning before the search by Federal Bureau of Investigation ("FBI") agents, because the FBI agents
     did not control and supervise the local officials' day-to-day operations.)  Nor does he fit into the third
     category of "persons acting on behalf of a federal agency in an official capacity," which has been
20   construed as covering "special situations such as the 'dollar-a-year' man who is in the service of the
     Government without pay, or an employee of another employer who is placed under direct supervision of a
     federal agency pursuant to contract or other arrangement."  *Logue v. United States*, 412 U.S. 521, 531
21   (1973); *see also Rodriguez v. Sarabyn*, 129 F.3d 760, 766 (5th Cir. 1997); *Andrade ex rel. Goodman v.
     United States*, No. 05-3240PHXMHM, 2008 WL 4183011, at *4 (D. Ariz. Sept. 8, 2008).  Therefore,
22   Officer Leetz's actions alone are not a predicate for liability under the FTCA.

1   person without legal authority." *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash.

2   1983).  "A person is restrained or imprisoned when he is deprived of either liberty of

3   movement or freedom to remain in the place of his lawful choice."  *Id.*  A person "may be

4   liable for false arrest or false imprisonment even if he or she is not the person who

5   physically restrains the plaintiff."  *Id.* at 500 n.3.  Specifically, a person "who participates

6   in an unlawful arrest, or procures or instigates the making of one without proper

7   authority, will be liable for the consequences" if he or she has "taken some active part in

8   bringing about the unlawful arrest itself, by some 'affirmative direction, persuasion,

9   request or voluntary participation.'"  *Id.* (quoting W. Prosser, *Torts* § 11, p. 47 (4th ed.

10  1971)); *see also Dunn v. Hyra*, 676 F. Supp. 2d 1172, 1195-96 (W.D. Wash. 2009).

11  However, a lawful seizure—for example, an arrest pursuant to a valid warrant—is a

12  complete defense to a claim for false arrest.  *Hanson v. City of Snohomish*, 852 P.2d 295,

13  301 (Wash. 1993); *see also Bender*, 664 P.2d at 499; *McKinney v. City of Tukwila*, 13

14  P.3d 631, 641 (Wash. Ct. App. 2000).[4]

15      **2.  Immigration officers' authority**

16      The authority of federal immigration officers to detain and arrest suspected aliens

17  is limited by the strictures of the Fourth Amendment.  *See Zepeda v. U.S. I.N.S.*, 753 F.2d

18  719, 725 (9th Cir. 1983).  Specifically, an immigration officer is authorized to "briefly

19  detain a person for questioning" if the officer "has a reasonable suspicion, based on

20  _____

21      [4] Because the parties do not distinguish between Mr. Vargas' false arrest and false imprisonment
    claims, the court considers them together for the purposes of this motion.  The court notes that, although
    false arrest and false imprisonment claims may sometimes overlap, false imprisonment typically requires

22  some type of confinement.  *See Kellogg v. State*, 621 P.2d 133, 137 (Wash. 1980).

1  specific, articulable facts, that the person . . . is an alien illegally in the United States."  8

2  C.F.R. § 287.8(b)(2).  Similarly, an immigration officer is also authorized to arrest a

3  person if the "officer has reason to believe that the person to be arrested . . . is an alien

4  illegally in the United States," a requirement which courts have equated with the

5  constitutional "probable cause" requirement.  8 C.F.R. § 287.8(c)(2); *Tejeda-Mata v.*

6  *I.N.S.*, 626 F.2d 721, 725 (9th Cir. 1980); *see also* 8 U.S.C. § 1357(a)(1), (2) (authorizing

7  immigration officers to "interrogate any . . . person believed to be an alien as to his right

8  to be or to remain in the United States," as well as to "arrest any alien . . . if he has reason

9  to believe that the alien so arrested is in the United States in violation of any such law or

10  regulation").  As such, the lawfulness of a Border Patrol agent's seizure turns on the

11  familiar principles of reasonable suspicion and probable cause:  if an agent detains a

12  person for a brief, investigatory stop, the stop must be supported by reasonable suspicion

13  that the person is unlawfully present in the United States, and if an agent arrests a person,

14  the arrest must be supported by probable cause that the person is unlawfully present in

15  the United States.  *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 497 (9th Cir. 1994); *Tejeda-*

16  *Mata*, 626 F.2d at 725; *Zepeda*, 753 F.2d at 725.

17      **3.  Detention or arrest**

18      The applicable standard depends on whether Mr. Vargas' initial traffic stop

19  remained an investigatory detention or morphed into an arrest.  *United States v. Bravo*,

20  295 F.3d 1002, 1009 (9th Cir. 2002) ("At issue here is whether a 'detention,' which does

21  *not* require probable cause, evolved into an 'arrest,' which *must* be supported by probable

22  cause.").  Generally, a detention "involves no more than a brief stop, interrogation and,

1   under proper circumstances, a brief check for weapons." *United States v. Miles*, 247 F.3d

2   1009, 1012 (9th Cir. 2001). "If the stop proceeds beyond these limitations, an arrest

3   occurs, which requires probable cause." *Id.*

4       There is, however, "no bright-line rule to determine when an investigatory stop

5   becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

6   "Rather, courts consider the totality of the circumstances, evaluating both the

7   intrusiveness of the stop as well as the justification for the use of such tactics . . . ." *Id.*

8   Specifically, "it is well-established that intrusive measures may convert a stop into an

9   arrest if the measures would cause a reasonable person to feel that he or she will not be

10   free to leave after brief questioning." *United States v. Guzman-Padilla*, 573 F.3d 865,

11   884 (9th Cir. 2009). Nonetheless, intrusive measures are justified if they are a reasonable

12   response in light of the circumstances that prompted the stop or that developed during its

13   course. *Id.* at 885.

14       Ordinarily, whether an encounter constitutes a detention or an arrest is a mixed

15   question of law and fact. *See United States v. Cormier*, 220 F.3d 1103, 1110 (9th Cir.

16   2000); *cf. United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001). Here, however,

17   the material historical facts are undisputed: At the time Agent Hafstadt instructed Officer

18   Leetz to seize Mr. Vargas, Mr. Vargas had already been subjected to a "brief stop [and]

19   interrogation" by Officer Leetz and Agent Hafstadt. *Miles*, 247 F.3d at 1012; (Leetz Dep.

20   at 7:20-22, 9:9-15, 10:4-11, 37:11-25; Vargas Dep. at 49:10-50:18.) Mr. Vargas was then

21   placed in handcuffs and transported from the site of the traffic stop to the Anacortes

22   police station in the back of Officer Leetz's patrol car. (Leetz Dep. at 14:11-13; Vargas

ORDER- 14

Dep. at 57:5-11, 16:9-17.)  At the police station, Mr. Vargas was confined in a holding

cell for approximately 30 to 40 minutes while waiting for an immigration officer to

arrive.  (Orr Dep. at 17:7-14; *see also* Leetz Dep. at 67:10-14.)  Once Agent Orr—who

was not conversant in Spanish—arrived, Mr. Vargas was interrogated a second time.

(Orr Dep. at 20:25-21:11, 23:3-23; Vargas Dep. at 62:17-63:1.)  Overall, the seizure

lasted approximately one hour.  (*See* Leetz Rep.; Leetz Dep. at 67:4-16.)

　　　　As discussed in detail below, Mr. Vargas' seizure contains multiple hallmarks of

an arrest.  Considering all of these factors together, the court concludes that the seizure

rose to the level of an arrest for the following reasons.  First, although there is no rigid

time limitation on *Terry* stops, the duration of the seizure militates against the

requirement that a detention be "brief."  *See United States v. Chamberlin*, 644 F.2d 1262,

1266 (9th Cir. 1980) (holding that questioning a suspect in the back of a patrol car for

twenty minutes constituted an arrest because "longer detentions must be justified by the

traditional requirement of probable cause"); *but see Gallegos v. City of L.A.*, 308 F.3d

987, 989 (9th Cir. 2002) (finding that detaining a suspect for 45 to 60 minutes to ascertain

his identity fell within the bounds of an investigatory stop because there was no "delay

unnecessary to the legitimate investigation").

　　　　Second, "handcuffing is a substantial factor in determining whether an individual

has been arrested."  *Bravo*, 295 F.3d at 1010; *see also United States v. Juvenile* (*RRA-A* ),

229 F.3d 737, 743 (9th Cir. 2000) ("[W]e conclude that [the respondant's] handcuffing

was the clearest indication that she was no longer free to leave and therefore find it to be

the point of arrest.").  Although handcuffing is not determinative when it is reasonably

1    necessary to ensure the safety of officers or the public, *Bravo*, 295 F.3d at 1010, there is

2    no indication that Officer Leetz feared or should have feared for his safety around Mr.

3    Vargas.  (*See* Leetz Dep. at 16:9-17 (agreeing that he placed Mr. Vargas in handcuffs

4    because "that's standard practice").)

5           Third, although no bright-line rule determines where an investigatory stop crosses

6    the line and becomes an arrest, "a distinction between investigatory stops and arrests may

7    be drawn at the point of transporting the defendant to the police station."  *United States v.*

8    *Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988); *see Hayes v. Florida*, 470 U.S. 811, 814-15

9    (1985) ("And our view continues to be that the line is crossed when the police, without

10   probable cause or a warrant, forcibly remove a person from his home or other place in

11   which he is entitled to be and transport him to the police station, where he is detained,

12   although briefly, for investigative purposes.  We adhere to the view that such seizures . . .

13   are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally

14   be made only on probable cause."); *Dunaway v. New York*, 442 U.S. 200, 216 (1979)

15   ("We accordingly hold that the . . . police violated the Fourth and Fourteenth

16   Amendments when, without probable cause, they seized petitioner and transported him to

17   the police station for interrogation.")

18          Of course, "reasons of safety and security [may] justify moving a suspect from one

19   location to another during an investigatory detention."  *Florida v. Royer*, 460 U.S. 491,

20   504-05 (1983).  The Ninth Circuit has clarified that moving a suspect does not

21   automatically turn a detention into an arrest "where the movement is a reasonable means

22   of achieving the legitimate goals of the detention given the specific circumstances of the

ORDER- 16

1   case." *United States v. Charley*, 396 F.3d 1074, 1080 (9th Cir. 2005) (finding that it was

2   reasonable for officers to escort the defendant to her house to ascertain whether her

3   children were safe); *Gallegos*, 308 F.3d at 993 (finding it was reasonable for officers to

4   drive a suspect a few miles to the scene of the crime to verify with witnesses whether he

5   was the burglar).

6       A key difference between the detentions at issue in *Charley* and *Gallegos* and Mr.

7   Vargas' seizure, however, is that Mr. Vargas was transported to the police station for

8   further questioning.  *See Hartfield v. Besner*, No. 3:11-CV-00100-KI, 2012 WL 2788050,

9   at *6 (D. Or. July 9, 2012) (quoting *Parr*, 843 F.2d at 1231, *Hayes*, 470 U.S. at 816, and

10  *Dunaway*, 442 U.S. at 216).  "Such involuntary transport to a police station for

11  questioning is sufficiently like arrest to invoke the traditional rule that arrests may

12  constitutionally be made only on probable cause." *Kaupp v. Texas*, 538 U.S. 626, 630,

13  (2003) (internal punctuation omitted).  Accordingly, the Ninth Circuit recognizes that

14  "the coerciveness created by isolating a suspect in a private space controlled by the

15  police" is a "crucial factor" in determining whether moving a suspect exceeds the bounds

16  of a *Terry* stop.  *United States v. Baron*, 860 F.2d 911, 916 (9th Cir. 1988); *see also*

17  *Orozco v. Cnty. of Yolo*, 814 F. Supp. 885, 894 (E.D. Cal. 1993) ("Clearly, the

18  circumstances of the [plaintiffs'] detention became so coercive as to be indistinguishable

19  from a full-scale arrest when the officers transported the [plaintiffs] to the sheriff's

20  station without their consent.")

21      Fourth, "whether the police physically restrict the suspect's liberty is an important

22  factor in analyzing the degree of intrusion effected by the stop." *Lambert*, 98 F.3d at

1189.  The Ninth Circuit has noted that once a person is locked in a holding cell, "no

reasonable person would have believed he was free to leave."  *Bravo*, 295 F.3d at 110-11

(quoting *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000)); *see also id.* at 1017

("We held that custody began when the defendant was placed in the locked cell and had

his shoes and belt taken.").

        Fifth, although Officer Leetz informed Mr. Vargas at the site of the traffic stop

that he was not under arrest (Leetz Dep. at 59:10-15), "[c]ertainly an officer cannot

negate a custodial situation simply by telling a suspect that he is not under arrest."

*Bravo*, 295 F.3d at 1011; *see also United States v. Lee,* 699 F.2d 466, 467 (9th Cir.1982)

(per curiam) (holding that the defendant was in custody even though agents informed him

that he was "free to leave").

        Sixth, the fact that Agent Hafstadt and Officer Leetz maintain that they only

intended to detain Mr. Vargas in order to further investigate his immigration status does

not alter the legal analysis of whether their actions constituted an arrest.  (*See* (Leetz Dep.

at 59:4-8; Hafstadt Dep. at 35:25-36:6; Orr Dep. at 6:17 ("Yeah, technically we don't

arrest anybody.  We detain.").)  Whether Mr. Vargas' seizure "was an arrest or an

investigatory stop depends on what the officers *did,* not on how they *characterize* what

they did."  *Gallegos*, 308 F.3d at 992.  "[W]here the defendant is transported to the police

station and placed in a cell or interrogation room he has been arrested, even if the purpose

of the seizure is investigatory rather than accusatory."  *Gonzales v. City of Peoria*, 722

F.2d 468, 477 (9th Cir. 1983) *overruled in unrelated part by Hodgers-Durgin v. de la*

*Vina*, 199 F.3d 1037 (9th Cir. 1999).

1    Finally, in *Gonzales*, the Ninth Circuit addressed a law enforcement policy that

2    purported to authorize seizures almost identical to Mr. Vargas' seizure. *See Gonzales*,

3    722 F.2d at 477, *overruled in unrelated part by Hodgers-Durgin*, 199 F.3d 1037.   The

4    Ninth Circuit held that when suspected aliens "are walked or driven to the police station

5    and held pending interrogation by the Border Patrol," that "seizure constitutes an arrest,

6    and the constitutional standards cannot be avoided by labeling it a mere detention."

7    *Gonzales*, 722 F.2d at 477, *overruled in unrelated part by Hodgers-Durgin*, 199 F.3d

8    1037.

9    Taking into account the totality of the circumstances described above, and

10   evaluating the intrusiveness of the seizure and the lack of justification for such tactics, the

11   court finds that Mr. Vargas' detention evolved into an arrest. *See Bravo*, 295 F.3d at

12   1009.

13   **4. Probable cause**

14   Because Mr. Vargas' seizure was an arrest, it was unlawful unless it was

15   supported by probable cause. *United States v. Hernandez*, 322 F.3d 592, 596 (9th Cir.

16   2003). In general, "[p]robable cause to arrest exists when officers have knowledge or

17   reasonably trustworthy information sufficient to lead a person of reasonable caution to

18   believe an offense has been or is being committed by the person being arrested." *Harper*

19   *v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *Beck v. State of Ohio*, 379

20   U.S. 89, 91 (1964)).  Whereas "conclusive evidence of guilt is of course not necessary

21   under this standard to establish probable cause, mere suspicion, common rumor, or even

22   //

1 │ strong reason to suspect are not enough."[5]  *Harper*, 533 F.3d at 1022 (quoting *United*

2 │ *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal quotations omitted).

3 │      Although local law enforcement officers must find probable cause of criminal

4 │ activity before making an arrest, immigration officers may arrest solely on the basis of

5 │ unlawful presence in the United States.  *See Tejeda-Mata*, 626 F.2d at 725; 8 U.S.C.

6 │ § 1357(a)(1), (2); *Melendres v. Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012); *United*

7 │ *States v. Garcia-Rivas*, 520 F. App'x 507, 509 (9th Cir. 2013).  Both probable cause and

8 │ reasonable suspicion are evaluated based on the "totality of the circumstances."  *United*

9 │ *States v. Arvizu*, 534 U.S. 266, 274 (2002).  This process "precludes a 'divide-and-

10 │ conquer analysis' because even though each of the suspect's 'acts was perhaps innocent

11 │ in itself . . . taken together, they may warrant further investigation.'"  *United States v.*

12 │ *Valdes-Vega*, 738 F.3d 1074, 1078-79 (9th Cir. 2013) (citing *Arvizu*, 534 U.S. at 274).

13 │      Whether an arrest is supported by probable cause is typically a mixed question of

14 │ law and fact.  *United States v. Hernandez*, 322 F.3d 592, 596 (9th Cir. 2003); *Tsao v.*

15 │ *Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012).  Where the material historical

16 │ facts are undisputed, however, a court may decide the existence of probable cause or

17 │ reasonable suspicion as a matter of law.  *Tsao*, 698 F.3d at 1146; *Peng v. Mei Chin*

18 │ *Penghu*, 335 F.3d 970, 979–80 (9th Cir. 2003); *Harper*, 533 F.3d at 1022.

19 │

──────────────

20 │      [5] Reasonable suspicion, on the other hand, "is a less demanding standard than probable cause."
   │ *Gallegos*, 308 F.3d at 990 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  Reasonable suspicion

21 │ exists when an officer is aware of "specific, articulable facts which, together with objective and
   │ reasonable inferences, form the basis for suspecting that the particular person detained is engaged in
   │ criminal activity."  *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011); *see also Gonzalez-Rivera v.*

22 │ *I.N.S.*, 22 F.3d 1441, 1445 (9th Cir. 1994); *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 497 (9th Cir. 1994).

1        Here, it is undisputed that Agent Hafstadt considered the following circumstances:

2    Mr. Vargas did not have a Social Security number associated with his Washington State

3    driver's license; the Border Patrol databases did not have a record of any previous

4    interactions between Mr. Vargas and the United States' immigration system; and Officer

5    Leetz suspected that Mr. Vargas was undocumented.  (*See* Hafstadt Dep. at 12:9-17,

6    26:12-27:9; Leetz Dep. at 8:5-9:7, 38:24-39:23.)  In addition, viewing the disputed

7    evidence in the light most favorable to the United States, *see Reeves*, 530 U.S. at 150, it

8    appears that Agent Hafstadt likely considered that:  Mr. Vargas spoke English with a

9    Spanish accent and Officer Leetz found it difficult to communicate with him in English;

10   the traffic stop occurred in a town with an international ferry terminal and a maritime

11   border; a population of undocumented workers was believed to reside near Anacortes;

12   and Officer Leetz observed Mr. Vargas appeared to be "Mexican" or "Hispanic."

13   (Hafstadt Dep. at 12:9-17, 26:12-27:9; Leetz Leetz Dep. at 8:5-9:7; 38:24-39:24-1; Plf.

14   Mot. at 6 n.3 (listing disputed factors).[6]

15       Although these factors are relevant to the probable cause determination, under

16   Ninth Circuit caselaw, many of these factors are minimally probative, even when viewed

17   _____

18       [6] In a footnote in his response brief, Mr. Vargas maintains that his refusal to answer Agent
     Hafstadt's questions "was not a legitimate factor the agent could consider in his reasonable suspicion
19   analysis."  (Plf. Resp. at 10 n.8 (citing *I.N.S. v. Delgado*, 466 U.S. 210, 216-17 (1984) (finding that "if the
     persons refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth
     Amendment imposes some minimal level of objective justification to validate the detention or seizure));
20   *see also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[W]hen an officer, without reasonable suspicion
     or probable cause, approaches an individual, the individual has a right to ignore the police and go about
21   his business.").   The United States does not contend that Mr. Vargas' silence was a legitimate factor for
     Agent Hafstadt to consider.  (*See generally* Def. Mot.; Def. Resp.; Def. Reply.)  Because the United
22   States does not address the issue, the court will not consider Mr. Vargas' silence as a factor in the
     probable cause analysis.

ORDER- 21

1   in conjunction.  *See United States v. Manzo-Jurado*, 457 F.3d 928, 935 (9th Cir. 2006)

2   (listing relevant factors); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)

3   (same).  Considering the entirety of the circumstances, the court finds that, although these

4   factors may raise suspicion as to the legality of Mr. Vargas' presence in the United

5   States, they do not give rise to probable cause.  *See Harper*, 533 F.3d at 1022 (stating that

6   "even strong reason to suspect" criminal activity is not enough to establish probable

7   cause).

8                    **a.  Language, appearance, and location**

9           In *United States v. Manzo-Jurado*, the Ninth Circuit found that the facts that a

10   group of Hispanic-looking men appeared to be in a work crew, conversed with each other

11   in Spanish, did not understand English, and were located in close proximity to the

12   Canadian border did not give rise to even a reasonable suspicion that the group included

13   undocumented workers because the observed factors merely "form[ed] a broad profile

14   that would cover many lawful . . .  immigrants."  457 F.3d 928, 939 (9th Cir. 2006).  The

15   Ninth Circuit held that "to establish reasonable suspicion, an officer cannot rely solely on

16   generalizations that, if accepted, would cast suspicion on large segments of the

17   lawabiding population."  *Id.* at 935.  Mr. Vargas' situation implicates similar factors as

18   those considered in *Manzo-Jurado*, and, hence, similar concerns.

19           Specifically, with respect to language ability, the Ninth Circuit found that the

20   information that the men spoke Spanish to each other and did not understand the agent

21   when he spoke English "while not dispositive, may support a finding of reasonable

22   suspicion when other factors suggest that the individuals stopped are present in this

1  country illegally." *Id.* at 937.  Accordingly, Mr. Vargas' accented English supports a

2  finding of reasonable suspicion.[7]  However, it does so with somewhat less force than the

3  language difficulty identified in *Manzo-Jurado*:  there, the men evinced no competency

4  in English, but here it is undisputed that Mr. Vargas communicated with at least Agent

5  Hafstadt in English.  (*See* Leetz Dep. at 13:2-12, 49:6-50:10; Vargas Dep. at 50:6-15.)

6      Furthermore, "[s]tops based on race or ethnic appearance send the underlying

7  message to all our citizens that those who are not white are judged by the color of their

8  skin alone . . . and that those who are not white enjoy a lesser degree of constitutional

9  protection."  *United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) (en

10  banc); *see also Melendres v. Arpaio*, 989 F. Supp. 2d 822, 896 (D. Ariz. 2013) ("[In

11  general,]  the race of an individual cannot be considered when determining whether an

12  officer has or had reasonable suspicion in connection with a *Terry* stop, including for

13  immigration investigation.")  Nonetheless, the Ninth Circuit has found that an

14  individual's apparent Hispanic ethnicity may be "a relevant factor in the reasonable

15  suspicion inquiry" in areas sparsely populated by Hispanics, although it "cannot by itself

16  justify an investigatory stop."  *Manzo-Jurado*, 457 F.3d at 935; *but see Montero-*

17  *Camargo*, 208 F.3d at 1132 (9th Cir. 2000) ("The likelihood that in an area in which . . . a

18  substantial part of the population is Hispanic, any given person of Hispanic ancestry is in

19  fact an alien, let alone an illegal alien, is not high enough to make Hispanic appearance a

20  ────────────────────

21  [7] The parties put forth various evidence disputing Mr. Vargas' proficiency in English.  (*See* Plf. Resp. (Dkt. # 39) at 15-16 (emphasizing that Mr. Vargas was able to communicate in English with both Agent Hafstadt and Agent Orr, but conceding that he speaks English with a "heavy accent"); Def. Mot. at 7-9 (emphasizing Officer Leetz's trouble communicating with Mr. Vargas).  For the probable cause

22  analysis, however, the court considers only the facts known to Agent Hafstadt at the time of the arrest.

1    relevant factor in the reasonable suspicion calculus.").  The Ninth Circuit in *Manzo-*

2    *Jurado* found that apparent ethnicity was relevant where the population of the Montana

3    town was only 1.5% Hispanic.  *See Manzo-Jurado*, 457 F.3d at 935.  Census statistics

4    show that in 2010, 5% of Anacortes residents and 11% of Washington residents identified

5    as "Hispanic or Latino."  (Plf. Resp. at 12.)  Therefore, the court concludes that this

6    factor, while relevant, is somewhat less probative than it was in *Manzo-Jurado*.

7         Lastly, in *Manzo-Jurado*, the Ninth Circuit found that the significance of the

8    suspected aliens' proximity to the Canadian border was "not overriding here because the

9    record does not establish that [the locations], in particular, are locations notorious for

10   containing illegal immigrants."  *Manzo-Jurado*, 457 F.3d at 936.  Here, the facts that

11   Anacortes is located approximately 60 miles from the Canadian border and receives

12   ferries arriving from Canada achieve relatively greater significance in light of the Border

13   Patrol agents' testimony that Anacortes supports a population of undocumented workers.

14   *See* Hafstadt Dep. at 27:4-5 ("[T]here is a population of illegal aliens in the area."), 53:6-

15   7 ("I believe illegal aliens . . . have utilized the ferry."); Wynn Dep. at 56:20-23 ("Q:

16   Why do you say there is a large illegal immigration population? A: Because of the

17   amount of – this is a migrant community.  We have seasonal farmers."); *but see* Leetz

18   Dep. at 51:22-52:11 (testifying that Anacortes did not have a large immigrant population

19   and that he was unaware whether the migrant populations in nearby cities include a large

20   number of undocumented workers).

21        The significance is limited, however, by the fact that neither the Border Patrol

22   agents nor the United States provide any objective substantiation of the agents' opinions.

ORDER- 24

1    (*See* Wynn Dep. at 56:17-19 ("Q: What is the number of illegal immigrants living in

2    Anacortes? A: I don't know."), 58:1-5 ("Q: So how many apprehensions were made there

3    in the past? A: I don't have a number.  Q: . . . [H]ow are you rating that as a large illegal

4    immigration population if you don't have a number?  A: It's my opinion."), 59:1-7

5    "A: . . . [I]n my own opinion, I believe that there is a higher immigration population

6    nationally within border communities. Q. . . . You don't have any specific numbers to

7    Anacortes?  A: No, I don't have any numbers."); Aldana Decl. Ex. # 5 ("U.S. Disc.

8    Resp.") at 356-57 (declining to identify the suspected population of undocumented

9    workers in Anacortes and the number of undocumented people apprehended attempting

10   to enter the United States via Canada and/or the maritime Canadian border at Anacortes

11   in the last five years).)  Although an agent may rely on experience to assess certain

12   factors, "permissible deductions, or rational inferences, must, however, flow from

13   objective facts and be capable of rational explanation."  *Orhorhaghe v. I.N.S.*, 38 F.3d

14   488, 499 (9th Cir. 1994) (internal quotation marks omitted).

15       The significance of the location is further limited by Agent Hafstadt's admissions

16   that he did not suspect that Mr. Vargas was arriving from the ferry terminal[8] (Hafstadt

17   Dep. at 27:12-14) and that the location factors he identified were not specific to illegal

18   immigrants, but rather would apply to anyone found in the area, (*id*. at 29:7-8).  *See*

19   *Manzo-Jurado*, 457 F.3d at 936 ("[A] location or route frequented by illegal immigrants,

20

21       [8]  Agent Hafstadt's conclusion is supported by the fact that Mr. Vargas possessed a Washington
     driver's license and was driving a car registered in Washington, (Leetz Dep. at 8:1-4, 22:7-23; Leetz
22   Rep.), as well as the fact that the international ferries at Anacortes pass through a checkpoint managed by
     Customs and Border Protection officers (Hafstadt Dep. at 54:10-55:8).

but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion.").  Accordingly, the court concludes that, as in *Manzo-Jurado*, the traffic stop's proximity to the Canadian border is not overriding.  *See* 457 F.3d at 936.

### b.  Border Patrol databases, Social Security number, and Officer Leetz's opinion

As the preceding analysis shows, if language, ethnicity, and location were the only factors considered, under *Manzo-Jurado* the United States would be hard pressed to show even reasonable suspicion.  *See id.*  Here, however, Agent Hafstadt considered additional factors.  Nonetheless, as discussed below, the court finds that these additional factors are insufficient to raise the level of suspicion to that of probable cause.

First, the fact that the Washington State Department of Licensing database did not associate a Social Security number with Mr. Vargas' license is not necessarily, or even probably, indicative of unlawful presence in the United States.  Washington State does not require individuals to provide their Social Security number in order to obtain a driver's license so long as state residency is proved.  *See, e.g.*, RCW 46.20.091; WAC 308-104-014(4).  Moreover, as the United States admits, not all United States citizens born in the United States have a Social Security number (Aldana Decl. Ex. 8 ("Resp. to RFAs") # 11), and not all foreign-born individuals lawfully in this country have a Social Security number, *see* 20 C.F.R. § 422.104(a) (defining when lawfully admitted aliens are eligible to receive a Social Security Number).

Second, Officer Leetz's suspicion of illegal presence, although relevant, is not entitled to great deference.  *See Manzo-Jurado*, 457 F.3d at 934-35 ("[W]e will defer to

1   officers' inferences only when such inferences rationally explain how the objective

2   circumstances aroused a reasonable suspicion that *the particular person being stopped*

3   *had committed or was about to commit a crime.*") (quoting *Montero-Camargo*, 208 F.3d

4   at 1129) (internal punctuation omitted).  As an Anacortes police officer, Officer Leetz

5   had not received any training specific to immigration law and in fact explicitly disavowed

6   any expertise on the subject.  (Leetz Dep. at 20:13-15, 88:21-24.)  Officer Leetz's

7   suspicion was based only on Mr. Vargas' language, appearance, and apparent lack of a

8   Social Security number—he did not ask Mr. Vargas any questions regarding his

9   immigration status.  (Leetz Dep. at 20:3-9.)  Officer Leetz, however, does not know that

10  Washington State did not require a Social Security number in order to obtain a driver's

11  license (Leetz Dep. at 8:17-22), and as such his reliance on that factor was misplaced.

12  Beyond that, Officer Leetz's assumption was based on nothing more than the broad

13  generalizations that are of little weight in the probable cause analysis.  *United States v.*

14  *Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) ("[R]easonable suspicion may

15  not be based on broad profiles which cast suspicion on entire categories of people without

16  any individualized suspicion of the particular person to be stopped.") (internal

17  punctuation omitted).

18          Finally, as the United States concedes, the fact that no record of Mr. Vargas

19  existed in the Border Patrol databases (aside from the record indicating that he possessed

20  a driver's license) was not necessarily indicative of unlawful presence.  (*See* Resp. to

21  RFA # 18.)  With respect to immigration, the database search revealed that Mr. Vargas

22  had not  previously  been deported, received an employment authorization card, been

1    arrested by immigration authorities, filed an immigration application or petition,

2    registered as having entered the country at a port of entry, registered as inspected or

3    admitted to the United States, or been assigned an immigrant number.  (Hafstadt Dep. at

4    15:19-19:3.)  In addition, the database search revealed that Mr. Vargas did not have a

5    criminal record.  *Id.*

6            These databases, however, did not include information on all individuals who

7    were born in the United States, on all foreign-born individuals in the United States, or, on

8    all individuals who are United States citizens by virtue of deriving or acquiring their

9    citizenship through a parent or grandparent who was born in the United States.  (U.S.

10   Disc. Resp. at 351-52; *see also* Hafstadt Dep. at 25:15-26:11 (confirming that, absent a

11   criminal history, a citizen born in the United States would not appear in the database

12   records, and that a citizen who acquired citizenship through a parent or grandparent

13   would not be included in the database if he or she had never made an application for

14   citizenship).)[9]  For this reason, the United States concedes that "Mr. Vargas' lack of an

15   immigration record or history was indicative of unlawful presence in the United States *if*

16   *he was not born in the United States*."  (Resp. to RFA # 18 (emphasis added).)  At the

17   time of the traffic stop, however, Officer Leetz had not asked Mr. Vargas whether he was

18   an immigrant, where he had been born, or what his immigration status was.  (Leetz Dep.

19   at 20:3-9).  As such, at that point, the lack of records was "at least as consistent with [Mr.

20   _____

21        [9] (*See also* Reyes Dep. at 14:23-15:6 ("A:  Well, if you're a US-born citizen, you've never had
     any arrests, never had your fingerprints taken for anything, then, no, it probably wouldn't show up on any
22   of those systems.").)

1    Vargas'] legal presence in this country as with illegal alien status." *Orhorhaghe*, 38 F.3d

2    at 499.

3           In *Orhorhaghe*, the Ninth Circuit found that the petitioner's absence from the

4    immigration computer system "did not provide any additional basis for suspecting that

5    [the petitioner] was an illegal alien rather than a legal alien or American citizen" because

6    "no matter how perfect the database as to those entering the country, it would not reflect

7    the names of those born here." 38 F.3d at 499.  Those same concerns are implicated here,

8    although the court notes that the databases referenced in this case appear to be more

9    comprehensive than those at issue in *Orhorhaghe*.  Taking this difference into account,

10   the court finds that the lack of database records on Mr. Vargas is a relevant, but by no

11   means overriding, factor in the probable cause analysis.[10]

12          **c.  Totality of the circumstances**

13          The United States argues that Agent Hafstadt possessed reasonable suspicion that

14   Mr. Vargas was unlawfully present in the United States.  (Def. Mot. at 11-13.)  If that

15   were the question, the court would have to agree that the United States had made a strong

16   showing of reasonable suspicion.  *See Liberal*, 632 F.3d at 1077.  The United States does

17   not once contend, however, that Agent Hafstadt possessed probable cause to arrest Mr.

18   _____

19          [10] The court notes that Agent Hafstadt testified that, in his experience, it was a "remote"
20   possibility that someone not listed in the immigration databases would nonetheless have lawful status.
     (Hafstadt Dep. at 26:3-9.)  The Ninth Circuit, however, previously refused to rely on an immigration
     officer's testimony  that "when you are unable to locate any record of an individual under their apparent
21   true names . . .  nine times out of ten, the individual is, in fact, illegally present in the United States,"
     because the objective facts showed that the databases contained gaps.  *Orhorhaghe*, 38 F.3d at 499.
22   Similar concerns limit the persuasiveness of Agent Hafstadt's testimony here.

ORDER- 29

1   Vargas at the time of the traffic stop.  (*See generally* Def. Mot.; Def. Resp. (Dkt. # 38);

2   Def. Reply (Dkt. # 40).)  Taking into account all of the factors discussed above, and

3   viewing the disputed facts in the light most favorable to the United States, *Reeves*, 530

4   U.S. at 150, the court agrees with the United States' tacit admission that probable cause

5   was lacking.  Many of the observed facts on which Agent Hafstadt relied, such as

6   ethnicity, language, location, and a driver's license without a Social Security number,

7   merely implicated "generalizations that, if accepted, would cast suspicion on large

8   segments of the law-abiding population."  *Manzo-Jurado,* 457 F.3d at 935; *see also*

9   *Sigmond-Ballesteros*, 285 F.3d at 1121.  Although the background search results call Mr.

10  Vargas' presence in the United States into question, they fall short of establishing

11  probable cause because, absent an indication of Mr. Vargas birthplace or immigration

12  status, they are consistent with lawful immigration status.  *See Harper*, 533 F.3d at 1022

13  (stating that "even strong reason to suspect" criminal activity is not enough to establish

14  probable cause).  As such, the court concludes that, based on the totality of

15  circumstances, Agent Hafstadt did not have probable cause to arrest Mr. Vargas at the

16  time of the traffic stop.

17          **5.  Liability of the United States**

18          Lack of probable cause alone, however, does not establish the United States'

19  liability on the false arrest and false imprisonment claims.  *See Bender*, 664 P.2d. at 499.

20  Specifically, the United States contends that Agent Hafstadt requested Officer Leetz to

21  detain—not arrest—Mr. Vargas for further investigation, and that it was only Officer

22  Leetz's subsequent actions, such as handcuffing Mr. Vargas, that turned the requested

1   investigative detention into an arrest.  (Def. Mot. at 11-16; Def. Resp. at 2-3.)  The

2   United States argues that Agent Hafstadt's request was lawful because, at the time of the

3   traffic stop, Agent Hafstadt possessed a reasonable suspicion that Mr. Vargas was

4   unlawfully present in the United States.  (Def. Mot. at 11-16; Def. Resp. at 2-3.)  The

5   United States concludes that, because the United States cannot be held responsible for

6   Officer Leetz's actions under the FTCA, and because Agent Hafstadt's request for

7   detention was lawful, the United States cannot be found liable under the false arrest and

8   false imprisonment claims.  (Def. Mot. at 11-16; Def. Resp. at 2-3.)

9       The United States is correct that it is only liable to the extent that its employee,

10  Agent Hafstadt, would be liable under Washington law.  *See* Section III.B; 28 U.S.C.

11  § 1346(b)(1).  The United States, however, misconstrues the extent to which Agent

12  Hafstadt is liable under Washington law.

13      In Washington, a person "may be liable for false arrest or false imprisonment even

14  if he or she is not the person who physically restrains the plaintiff."  *Bender*, 664 P.2d at

15  500 n.3.  Specifically, a person "who participates in an unlawful arrest, or procures or

16  instigates the making of one without proper authority, will be liable for the

17  consequences" if he or she has "taken some active part in bringing about the unlawful

18  arrest itself, by some 'affirmative direction, persuasion, request or voluntary

19  participation.'"  *Id.* (quoting W. Prosser, *Torts* § 11, p. 47 (4th ed. 1971)); *see also Dunn*,

20  676 F. Supp. 2d at 1195-96.  Under *Bender*, therefore, it is irrelevant that Agent Hafstadt

21  possessed reasonable suspicion to detain Mr. Vargas if Agent Hafstadt took "some active

22  part in bringing about" what was in fact his unlawful arrest.  *Id.*

ORDER- 31

1    As discussed below, the facts regarding Agent's Hafstadt's participation in Mr.

2    Vargas' arrest are almost entirely undisputed.  The court finds that, even viewing the few

3    disputed facts in the light most favorable to the United States, a jury could not reasonably

4    conclude that Agent Hafstadt did not take "some active part" in Mr. Vargas' arrest by

5    "some affirmative direction [or] request."  *See Reeves*, 530 U.S. at 150; *Celotex*, 477 U.S.

6    at 324; *Anderson*, 477 U.S. at 252; *Bender*, 664 P.2d at 500 n.3.

7        First, it is undisputed that Officer Leetz would not have detained Mr. Vargas after

8    the initial traffic stop absent Agent Hafstadt's instruction to do so.  (*See* Leetz Rep. ("I

9    advised him that I could only wait as long as it took me to complete my infraction, unless

10   they specifically requested me to retain Gustavo."); Leetz Dep. at 9:12-13 ("But I told

11   him my intent was to complete the ticket and release Mr. Vargas-Ramirez . . . ."), 10:12-

12   14 ("Q:  And you could only hold him as long as you needed to complete the traffic

13   infraction?  A:  Correct.  Q: So you were only going to give him a ticket and let him go?

14   A: Correct.").)

15       Second, Officer Leetz correctly understood that, as a local law enforcement

16   officer, he did not have the authority to detain Mr. Vargas solely for suspected unlawful

17   presence in the United States.  (*See* Leetz Dep. at 20:19-24; 24:1-2.)[11]  Officer Leetz,

18

19   _____

     [11] With certain limited exceptions that are inapplicable to the case at hand, state and local law

20   enforcement officers are not empowered to enforce federal civil immigration violations.  *Melendres v.
     Arpaio*, 695 F.3d 990, 1000-01 (9th Cir. 2012).  "[U]nlike illegal entry, mere unauthorized presence in the

21   United States is not a crime"; rather, an alien who is illegally present in the United States commits only a
     civil violation.  *Id.* at 1000; *see also United States v. Garcia-Rivas*, 520 F. App'x 507, 509 (9th Cir.

22   2013).  Investigative stops under *Terry*, however, must be premised on criminality.  *Melendres*, 695 F.3d
     at 1000-01.  Thus, the "law is clear that illegal presence in the country is not sufficient to support a
     finding of probable cause to suspect criminal activity."  *Garcia-Rivas*, 520 F. App'x at 509; *see also*

1  however, believed that Border Patrol had the legal authority to detain Mr. Vargas and to

2  request him to take Mr. Vargas into custody, and he testified that he relied on Border

3  Patrol's perceived authority when he detained Mr. Vargas.  (*Id.* at 14:18-15:4, 16:4-8.)

4          Third, whatever Agent Hafstadt's subjective intentions, his request to Officer

5  Leetz necessarily implicated hallmarks of an arrest.  Regarding Agent Hafstadt's request

6  to detain Mr. Vargas, Officer Leetz testified:

7       A:  The agent that I was on the phone with requested that I detain him.

8       Q. . . . And how did he ask you to detain him?

9       A. He asked me to detain him and transport him to our office, Anacortes
     Police Department.

10

11      Q. Okay. And did the agent provide you with more specific instructions?

12      A. He said that . . . one of the agents would come down to Anacortes from
     Bellingham to meet me at the Anacortes Police Department with Mr.
     Vargas-Ramirez.

13

14 (Leetz Dep. at 13:16-14:1.)  As such, Agent Hafstadt's instructions to Officer Leetz

15 required Officer Leetz to transport Mr. Vargas from the traffic stop to the police station

16 for further interrogation, and to hold Mr. Vargas at the police station for 30 to 40 minutes

17 pending that interrogation.  As discussed above in Section III.C.3, such actions are

18 usually definitive of an arrest.

19 //

20

21 *Melendres*, 695 F.3d at 1001.  Accordingly, Mr. Leetz could not detain Mr. Vargas solely on his own
authority.  *See Garcia-Rivas*, 520 F. App'x at 509 (finding that a law enforcement officer did not have
probable cause to detain an alien who admitted unlawful presence in the United States for suspected
22 criminal activity).

ORDER- 33

1    Because the parties' dispute what constitutes common law enforcement practice,

2    the court declines to find that Officer Hafstadt should have known that Mr. Vargas would

3    be placed in handcuffs during transport and in a cell while awaiting further questioning.

4    (*See* Leetz Dep. at 16:9-17:8; Orr Dep. at 32:16-25.)  Further, the court acknowledges

5    that Agent Hafstadt did not exercise control over the specific actions Officer Leetz took

6    in effecting the requested detention.  Nonetheless, the United States cannot escape the

7    reality that Officer Leetz would not have transported Mr. Vargas to the station and held

8    him there for 40 minutes had Agent Hafstadt not requested that he do so.  In fact, absent

9    Agent Hafstadt's request, Officer Leetz would have simply let Mr. Vargas go.  Contrary

10   to the United States' contention at oral argument, the fact that Officer Leetz *could* have

11   declined to heed Agent Hafstadt's request is irrelevant when Officer Leetz chose to obey

12   it.

13       In sum, the court finds that these facts admit of only one reasonable conclusion:

14   Agent Hafstadt's "affirmative direction [or] request" to detain Mr. Vargas played an

15   "active part in bringing about" Mr. Vargas' unlawful arrest.  *See Bender*, 664 P.2d at 500

16   n.3; *Reeves*, 530 U.S. at 150.  Accordingly, summary judgment on the false arrest and

17   false imprisonment claims in favor of Mr. Vargas is appropriate.  *See Celotex*, 477 U.S. at

18   324; *Anderson*, 477 U.S. at 252.

19       **6.  Mr. Vargas' admission**

20       Mr. Vargas contends that the United States' liability on his false arrest claim

21   extends for the entire course of his detention, including the time that he spent at the

22   Bellingham Border Patrol station.  (Plf. Resp. at 17.)  This contention is incorrect because

1    it overlooks the fact that during his interview at the Anacortes police station Mr. Vargas

2    admitted to Agent Orr that he had been borne in Mexico, he had been living in the United

3    States for about ten years, and he did not have any immigration documents.  (Orr Dep. at

4    20:1-7; Vargas Dep. at 60:12-15.)  The knowledge that Mr. Vargas had been born outside

5    the United States, lacked immigration documents, and, per the Border Patrol databases,

6    had never been recorded as entering the country legally, gave rise to probable cause that

7    not only was Mr. Vargas was unlawfully present in the United States, but he had entered

8    the United States illegally.  *See Harper*, 533 F.3d at 1022.  As such, at the close of Agent

9    Orr's interview, Border Patrol had legal authority to detain Mr. Vargas for further

10   investigation.  *See Tejeda-Mata*, 626 F.2d at 725; 8 U.S.C. § 1357(a)(1), (2).  Mr. Vargas

11   does not seriously contend otherwise.  (*See* Plf. Resp. at 7 (conceding that the fact "no

12   record was found [in the Border Patrol databases] is not indicative of foreign birth or

13   unlawful status *absent a concession of foreign birth*") (emphasis added).  Because

14   probable cause is a complete defense to a false arrest claim, the United States' liability

15   for false arrest ended with Mr. Vargas' admission.  *See Hanson*, 852 P.2d at 301.

16          Mr. Vargas argues that the court should not consider his admission because it

17   arose as a result of an unlawful seizure.  (Plf. Resp. at 17.)  In effect, Mr. Vargas asks the

18   court to apply the exclusionary principle to his civil tort claim.

19          The exclusionary rule and the closely-related "fruit of the poisonous tree" doctrine

20   prohibit admission of evidence obtained as a product of illegal searches and seizures.

21   *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004).  The exclusionary rule,

22   however, is not a "necessary corollary of the Fourth Amendment."  *United States v. Leon*,

468 U.S. 897, 905-06 (1984). Rather, it is a "judicially created remedy designed to

safeguard Fourth Amendment rights generally through its deterrent effect, rather than a

personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S.

338, 354 (1974). Because the deterrent effect of applying the exclusionary rule in civil

cases is minimal and its cost is significant, as a general rule, evidence obtained in an

unlawful manner will not be excluded from civil proceedings. *INS v. Lopez-Mendoza*,

468 U.S. 1032, 1046 (1984); *see also Kelly*, 2013 WL 5770337, at *9 (noting that,

because the rule comes with "substantial social costs," courts "rarely apply the

exclusionary rule in civil contexts") (quoting *Leon*, 468 U.S. at 907-08).

　　　　Although the Ninth Circuit has yet to rule on this precise issue, numerous district

courts in this circuit, as well as three appellate courts in other circuits, have held that the

exclusionary rule is inapplicable in the context of civil tort claims. *See Smith v. Kelly*,

No. C11-623RAJ, 2013 WL 5770337, at *9-11 (W.D. Wash. Oct. 24, 2013) (holding that

the exclusionary rule was inapplicable to an action for false arrest).[12]  As such, courts

───────────

[12] *See also, e.g.*, *Lindsey v. Wyatt*, No. 02:10-CV-01437-HZ, 2013 WL 2319324, at *5 (D. Or. May 27, 2013) ("Even if the search warrant obtained by the individual Defendants was based on false statements or deliberate omissions, all of the evidence seized from Plaintiffs' residence is admissible in the context of these civil claims because the exclusionary rule . . . does not apply in subsequent civil challenges."); *Davis v. United States*, No. EDCV 07-0481-VAP OPX, 2010 WL 334502, at *21 n.26 (C.D. Cal. Jan. 28, 2010) ("Even if the shotgun was the fruit of an unlawful seizure, though, in a civil proceeding like this one, there is no exclusionary rule which would bar the Government from introducing it as evidence in a malicious prosecution lawsuit to establish probable cause."); *Lingo v. City of New York*, No. 6:12-CV-01019-MC, 2014 WL 1347468, at *9 (D. Or. Apr. 4, 2014) ("[T]he consensus of the case law is that neither the exclusionary rule nor the fruit of the poisonous [tree] doctrine apply to § 1983 cases."); *Fowler v. Calif. Highway Patrol*, No. 13-CV-01026-TEH, 2014 WL 1665046, at *10 (N.D. Cal. Apr. 25, 2014) ("[T]he exclusionary rule does not apply in the context of a civil suit under § 1983."); *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) ("The fruit of the poisonous tree doctrine cannot link the unreasonable seizure and search to Townes's conviction and incarceration because this evidentiary doctrine is inapplicable to civil § 1983 actions."); *Hector v. Watt*, 235 F.3d 154, 160 (3d Cir.

1    addressing civil tort claims for false arrest have routinely considered evidence uncovered

2    by an initially unconstitutional search or seizure to determine whether probable cause

3    later arose during the course of that search or seizure.  *See, e.g.*, *Lingo*, 2014 WL

4    1347468, at *9-11 (holding that, even though the officers' initial search was

5    unconstitutional, (1) the exclusionary rule did not apply to the officers' subsequent

6    detection of marijuana and (2) summary judgment on the false arrest claim was

7    appropriate because the officers had probable cause to arrest the plaintiff once they

8    discovered the marijuana); *Fowler*, 2014 WL 1665046, at *10 (holding that officers'

9    unreasonable traffic stop did not preclude facts discovered during the stop from creating

10   probable cause to arrest the plaintiff); *Lindsey*, 2013 WL 2319324, at *5 (holding, in an

11   action for malicious prosecution, that evidence procured pursuant to an unconstitutional

12   search could be considered when evaluating probable cause to prosecute); *McDaniel*, 828

13   P.2d at 85 (upholding admission of evidence obtained by an unconstitutional search to

14   show probable cause regarding a false arrest claim); *Kelly*, 2013 WL 5770337, at *8

15   ("Once [the officer] seized the firearm and discovered [the plaintiff's] felony record, he

16   had probable cause to lawfully continue his initially unlawful arrest of [the plaintiff].")[13]

17   _____

18   2000) (holding that the exclusionary rule is inapplicable to Section 1983 actions); *Wren v. Towe,* 130 F.3d
     1154, 1158 (5th Cir. 1997) (same).

19       [13] *See also Radwan v. Cnty. of Orange*, No. SACV 08-0786 AG, 2010 WL 3293354, at *11 (C.D.
     Cal. Aug. 18, 2010) *aff'd*, 519 F. App'x 490 (9th Cir. 2013) ("[T]he Court may not rely on earlier

20   constitutional violations and the doctrine of the fruit of the poisonous tree to support a finding that
     the search of the vehicle was a separate constitutional violation."); *Willis v. Mullins*, No. 1:04-CV-6542 AWI

21   BAM, 2014 WL 1643578, at *3 (E.D. Cal. Apr. 24, 2014) ("[T]he fruit of the poisonous tree doctrine
     does not carry over from criminal prosecution to civil Section 1983 suits so Defendants' bad entry did not
     disqualify later gathered evidence.").

22

1    Not only that, but the Supreme Court has held that the exclusionary rule does not

2    apply to immigration hearings.  *See Lopez-Mendoza*, 468 U.S. at 1046.  The Ninth Circuit

3    has since established an exception to that ruling, and held that the exclusionary rule may

4    apply in an immigration proceeding if the case "involves an egregious Fourth

5    Amendment violation."  *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1448 (9th Cir. 1994).

6    Mr. Vargas has cited no authority to support his contention that the exception should be

7    extended to the context of a civil tort claim.  (*See generally* Plf. Mot.; Plf. Resp.)  Even if

8    the exception did apply in the context of civil tort claims, Mr. Lopez has not shown that

9    Agent Hafstadt's and Agent Orr's conduct rose to the level of a "bad faith constitutional

10   violation" necessary to trigger the exception.  *See id.* at 1449 (finding an egregious

11   violation where officers stopped the petitioner "based solely on his Hispanic

12   appearance").  Specifically, there is no evidence that the agents deliberately violated the

13   Fourth Amendment.  *See Martinez-Medina v. Holder*, 673 F.3d 1029, 1035 (9th Cir.

14   2011).  Moreover, reasonable Border Patrol agents evaluating the range of factors and

15   equivocal doctrinal backdrop discussed in Section III.C.4 would not necessarily have

16   known that they lacked probable cause to arrest Mr. Vargas for unlawful status.  *See id.*

17   Therefore, the egregiousness exception is inapplicable to this case.

18       For all of these reasons, the court declines to apply the exclusionary rule to Mr.

19   Vargas' admission.  Consequently, the United States' liability for false arrest ended at the

20   time of that admission.

21   //

22   //

ORDER- 38

1    **D.      Abuse of Process**

2          "Abuse of process is the misuse or misapplication of the process, after the

3    initiation of the legal proceeding, for an end other than that which the process was

4    designed to accomplish." *Saldivar v. Momah*, 186 P.3d 1117, 1130 (Wash. Ct. App.

5    2008), *as amended* (July 15, 2008).  To prove the tort of abuse of process, a plaintiff must

6    show both "(1) the existence of an ulterior purpose to accomplish an object not within the

7    proper scope of the process, and (2) an act in the use of legal process not proper in the

8    regular prosecution of the proceedings." *Id.*  "[T]he crucial inquiry is whether the

9    judicial system's process . . . has been misused to achieve another, inappropriate end."

10   *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 699 P.2d 217, 220

11   (Wash. 1985) (quoting *Gem Trading Co. v. Cudahy Corp.*, 603 P.2d 828, 832 n.2 (Wash.

12   1979)).  However, "the mere institution of a legal proceeding even with a malicious

13   motive does not constitute an abuse of process." *Id.* at 220-21 (quoting *Fite v. Lee*, 521

14   P.2d 964, 968 (Wash. Ct. App. 1974)) (internal punctuation omitted).  Rather, "there

15   must be an act after filing suit using legal process empowered by that suit to accomplish

16   an end not within the purview of the suit." *Id.* at 221 (quoting *Batten v. Abrams*, 626

17   P.2d 98, 990 (1981)).

18         Here, Mr. Vargas "limits his abuse of process claim to the issuance of the I-213

19   [form]." (Plf. Resp. at 18.)  This form contains false information regarding Mr. Vargas'

20   initial encounters with Officer Leetz and Agent Orr.  (*See* Orr Dep. at 38:17-41:16;

21   *compare* I-213 Form *with* Leetz Rep.; Leetz Dep.)  Mr. Vargas contends that the Border

22   Patrol agents purposefully falsified the form's narrative in order to obscure the fact that

ORDER- 39

1   Mr. Vargas had been unlawfully arrested.  (*See* Plf. Mot. at 22-24.)  For the reasons

2   explained below, the court finds that Mr. Vargas cannot bring an abuse of process claim

3   predicated solely on the issuance of the form.

4        The I-213 Form, which is titled "Record of Deportable/Inadmissible Alien," is the

5   form that immigration officers use to record the biographical information of an

6   apprehended alien and to describe the details surrounding the alien's detention.

7   *Hernandez-Guadarrama*, 394 F.3d at 676; *see also Espinoza v. I.N.S.*, 45 F.3d 308, 309

8   (9th Cir. 1995), *as amended on denial of reh'g* (Jan. 12, 1995) ("The Form I–213 is

9   essentially a recorded recollection of a [Border Patrol agent's] conversation with the alien

10   . . . .").  This form is usually admissible in removal proceedings as evidence of a person's

11   immigration status.  *See Sanchez v. Holder*, 704 F.3d 1107, 1109 (9th Cir. 2012); *see also*

12   *Espinoza*, 45 F.3d at 31.  "Absent any indication that a Form I-213 contains information

13   that is manifestly incorrect or was obtained by duress, the [Board of Immigration

14   Appeals] has found the Form to be inherently trustworthy and admissible as evidence."

15   *Sanchez*, 704 F.3d at 1109; *see also Espinoza*, 45 F.3d at 311.

16        In Washington, the tort of abuse of process applies to "legal process, whether

17   criminal or civil."  *Sea-Pac Co.*, 699 P.2d at 220.  For purposes of this motion, the court

18   assumes without deciding that the tort also applies to administrative proceedings to

19   enforce United States immigration law.  *See* Def. Mot. at 18 (conceding that the removal

20   proceedings initiated against Mr. Vargas constitute legal process); *but see id.* at 221

21   (finding that an abuse of process claim concerning proceedings before the National Labor

22   Relations Board was not cognizable under Washington law because "no process issued in

ORDER- 40

1  Washington courts").  Even under that assumption, Mr. Vargas' claim fails as a matter of

2  law because he is unable to show a misuse of the immigration process that occurred

3  "after the initiation of the legal proceeding" against him.  *See Saldivar*, 186 P.3d at 1130.

4       Removal proceedings are initiated when United States Customs and Immigration

5  Enforcement ("ICE") files a Notice to Appear with the immigration court.  8 C.F.R.

6  § 1003.14 ("Jurisdiction vests, and proceedings before an Immigration Judge commence,

7  when a charging document is filed with the Immigration Court by [ICE].");

8  *Lazaro v. Mukasey*, 527 F.3d 977, 980 (9th Cir. 2008) ("The Immigration Court's

9  jurisdiction vests 'when a charging document is filed with the Immigration Court by the

10  Service.'") (quoting 8 C.F.R. § 1003.14.); *see also* 8 C.F.R. § 1003.13 ("*Charging*

11  *document* means the written instrument which initiates a proceeding before an

12  Immigration Judge."), § 1003.15 (establishing the requirements for the "contents of the

13  Notice to Appear for removal proceedings").  Here, Agent Reyes completed Mr. Vargas'

14  I-213 form on June 23, 2011, but ICE did not file the Notice to Appear with the

15  immigration court until July 2, 2011 (Def. Reply (Dkt. # 40) at 5).[14]  As Mr. Vargas

16  concedes, "[t]he charging document that initiated the removal proceedings was Form I-

17  862, Notice to Appear."  (Plf. Resp. at 18 n. 15.)

18       Mr. Vargas, however, cannot bring an abuse of process claim for acts that

19  occurred before the legal proceedings against him were initiated:  "The gist of the action

20  is the misuse or misapplication of the process, *after it has once been issued,* for an end

21  _____

22  [14] ICE ultimately agreed to administratively close the proceedings against Mr. Vargas.  (Admin. Close. (Dkt. # 34-6).)

1    other than that which it was designed to accomplish." *Loeffelholz v. Citizens for Leaders*

2    *with Ethics & Accountability Now (C.L.E.A.N.)*, 82 P.3d 1199, 1217 (2004), *as amended*

3    *on denial of reconsideration* (Mar. 2, 2004) (citing *Batten*, 626 P.2d at 990 (internal

4    punctuation omitted).)  Specifically, "there must be an act after filing suit using legal

5    process empowered by that suit to accomplish an end not within the purview of the suit."

6    *Sea-Pac Co.*, 699 P.2d at 220.  The mere fact that an I-213 form may be used as evidence

7    during the removal proceedings is insufficient to render it a part of the "legal process

8    empowered by" the removal proceedings.  *See id.*  Therefore, the act of issuing the I-213

9    form cannot be challenged under an abuse of process claim.  *See Ressy v. State, Dep't of*

10   *Corr.*, 176 Wash. App. 1035, at *5 (2013) (finding that the filing of and failure to update

11   an allegedly false declaration did not give rise to an abuse of process claim because the

12   declaration pre-dated the parole violation proceedings at issue).[15]

13         The same result is reached even if, contrary to 8 C.F.R. § 1003.14, the issuance of

14   the I-213 form is considered to be act that officially initiated the removal proceedings

15   against Mr. Vargas.  The Washington Supreme Court has made clear that "the mere

16   institution of a legal proceeding even with a malicious motive does not constitute an

17   abuse of process."  *Sea-Pac Co.*, 699 P.2d at 221.

18         Finally, Mr. Vargas' contention that the court should consider his claim in the

19   context of the overarching "immigration legal process" against him, which he believes

20   began with his interrogation and arrest, is untenable.  "It is generally accepted that 'the

21   _____

22   [15] Federal courts "may consider unpublished state decisions, even though such opinions have no
     precedential value."  *Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 (9th Cir. 2003).

ORDER- 42

1    judicial process must in some manner be involved' before a claim for abuse of process

2    will lie." *Oreskovich v. Eymann*, 129 Wash. App. 1032, at *3 n.2 (2005) (quoting W.

3    Page Keeton et al., Prosser and Keeton on the Law of Torts § 121 at 898 (5th ed. 1984));

4    *see also Sea-Pac Co.*, 699 P.2d at 220 ("[T]he crucial inquiry is whether the *judicial*

5    *system's* process . . . has been misused to achieve another, inappropriate end.") (emphasis

6    added).  In this case, the Border Patrol agents' actions to investigate Mr. Vargas do not

7    constitute or otherwise implicate the judicial system's process, and as such do not form

8    the basis for an abuse of process claim.  For all of these reasons, summary judgment on

9    Mr. Vargas' abuse of process claim is appropriate.[16]

10   **E.    Intentional Infliction of Emotional Distress**

11         To prevail on a claim for intentional infliction of emotional distress, a plaintiff

12   must show (1) extreme and outrageous conduct, (2) intentional or reckless infliction of

13   _____

14   [16] Even if issuing the I-213 form constituted legal process, Mr. Vargas' abuse of process claim
     would fail because he sets forth no evidence supporting his theory that the Border Patrol agents
15   intentionally falsified the information in order to cover up an unlawful arrest.  As is common practice at
     the Border Patrol station, Agent Reyes filled out the form on behalf of Agent Orr because Agent Orr's
16   shift was over.  (Orr Dep. at 35:15-24; Wynn Dep. at 11:16-12:4.)  Agent Reyes' testimony that the form
     describes the facts as he understood them to be at the time is uncontroverted.  (*See* Reyes Dep. at 27:7-25;
17   *see also* Wynn Dep. at 19:22.)  Mr. Reyes testified that he based the form's narrative on information
     provided to him by Agent Orr, his supervisor, and the citation written by Officer Leetz (Reyes Dep. at
18   22:16-24:13), and that any discrepancies on the form were "basically just more mistake than anything
     else, and confusion between the shift change."  (Reyes Dep. 38:12-19; *see also id.* at 39:16-18 (explaining
19   that he assumed the location stated on the traffic citation was the address Agent Orr reported to because
     "[o]ur normal practice is to go where the officer is, not the station.").)  Mr. Vargas' insinuation that, if
20   Agent Reyes did not intentionally falsify the form, then the other agents must have lied to Agent Reyes in
     order to whitewash their actions (*see* Plf. Reply at 10-11) finds no support in the record before the court,
     and as such appears to be based on sheer speculation.  A "mere scintilla of evidence" is insufficient to
21   withstand a motion for summary judgment, because the factfinder "is permitted to draw only those
     inferences of which the evidence is reasonably susceptible; it may not resort to speculation."  *British*
     *Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).  Mr. Vargas raises, at best, a scintilla of
22   evidence to support his allegation that the Border Patrol agents intentionally falsified his I-213 form.
     Accordingly, for this reason also, summary judgment on the abuse of process claim is appropriate.  *See id.*

1  emotional distress, and (3) an actual result of severe emotional distress. *Kloepfel v.*

2  *Bokor*, 66 P.3d 630, 632 (Wash. 2003). The elements of outrage are generally factual

3  questions for the jury. *Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 769 (Wash. Ct.

4  App. 2014). However, a trial court faced with a summary judgment motion must "make

5  an initial determination as to whether the conduct may reasonably be regarded as so

6  'extreme and outrageous' as to warrant a factual determination by the jury." *Id.* (citing

7  *Doe v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 167

8  P.3d 1193, 1204 (Wash. Ct. App. 2007)).

9      In Washington, "[t]he law intervenes only where the distress inflicted is so severe

10  that no reasonable person could be expected to endure it." *Saldivar v. Momah*, 186 P.3d

11  1117, 1130 (2008), *as amended* (July 15, 2008). As such, any claim for intentional

12  infliction of emotional distress must be predicated on behavior "so outrageous in

13  character, and so extreme in degree, as to go beyond all possible bounds of decency, and

14  to be regarded as atrocious, and utterly intolerable in a civilized community." *Kloepfel*,

15  66 P.3d at 632. For example, a court found extreme and outrageous behavior when a

16  man threatened to kill his former girlfriend, threatened to kill the man she was dating,

17  watched her home, called her home 640 times, called her work 100 times, and called the

18  homes of men she knew numerous times, forcing her to spend weekends away from

19  home to avoid him. *See id.* at 632. On the other hand, a court found that abducting a pet

20  cat from a front porch and killing it by setting it on fire with gasoline, while "deplorable,"

21  did not rise to level of "necessary severity" that constitutes extreme and outrageous

22  behavior. *Womack v. Von Rardon*, 135 P.3d 542, 545 (Wash. Ct. App. 2006).

ORDER- 44

1    Here, Mr. Vargas' claim for intentional infliction of emotional distress is based on

2    two events:  (1) his unlawful arrest and (2) the false information on the I-213 form.  (Plf.

3    Resp. at 24.)  Viewing the evidence in the light most favorable to Mr. Vargas, *see Reeves*,

4    530 U.S. at 150, the court finds that the Border Patrol agents' actions were not

5    "so outrageous in character, and so extreme in degree, as to go beyond all possible

6    bounds of decency," *Kloepfel*, 66 P.3d at 632.  As discussed in the preceding section,

7    there is no evidence that the Border Patrol agents intentionally falsified information on

8    the I-213 form.  *See* Section III.D.  Moreover, the agents who detained Mr. Vargas did so

9    on the belief that they had reasonable suspicion to detain him for further investigation and

10   that therefore they were acting within their statutory authority.  (Hafstadt Dep. at 35:25-

11   36:10; Orr Dep. at 27:15-28:4; Reyes Dep. at 15:7-23.)

12   Finally, there is no evidence that the agents treated Mr. Vargas during his

13   detention in a manner that would be "regarded as atrocious, and utterly intolerable in a

14   civilized community."  *See Kloepfel*, 66 P.3d at 632.  Being held in a cold jail cell

15   without shoes (Vargas Dep. at 57:15-17, 62:24-63:1, 71:22-25), while being repeatedly

16   questioned about your immigration status (*id.* at 58:2-60:11) and instructed to sign

17   documents without adequate time to read them (*id.* at 69:4-71:16), while unpleasant, does

18   not rise to the level of "necessary severity" that constitutes extreme and outrageous

19   behavior.  *Womack*, 135 P.3d at 261.  As such, it is the court's initial determination that

20   the Border Patrol agents' conduct, even when viewed in the light most favorable to Mr.

21   Vargas, may not "reasonably be regarded as so 'extreme and outrageous' as to warrant a

22   //

1   factual determination by the jury." *Sutton*, 324 P.3d at 769.  Therefore, summary

2   judgment on this claim is appropriate.[17]

3   **F.   Negligent Infliction of Emotional Distress**

4            A plaintiff may recover on a claim for negligent infliction of emotional distress by

5   proving negligent conduct, which consists of the familiar elements of duty, breach,

6   proximate cause, and harm, as well as that the resulting emotional distress is (1) within

7   the scope of foreseeable harm of the negligent conduct, (2) a reasonable reaction given

8   the circumstances, and (3) manifest by objective symptomatology.  *Schmidt v. Coogan*,

9   335 P.3d 424, 430 (Wash. 2014); *Kumar v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash.

10  Ct. App. 2014).  A plaintiff, however, "may not base claims of negligence on alleged

11  intentional actions, such as excessive force or unlawful arrest."  *Lawson v. City of Seattle*,

12  No. C12-1994-MAT, 2014 WL 1593350, at *13 (W.D. Wash. Apr. 21, 2014) (granting

13  summary judgment on a negligent infliction of emotional distress claim predicated on the

14  intentional acts underlying the plaintiff's false arrest claim); *see St. Michelle v. Robinson*,

15  759 P.2d 467, 470 (Wash. Ct. App. 1988) ("[T]he abuse was an intentional act, and the

16  ———————————

17  [17] Mr. Vargas' intentional infliction of emotional distress claim is predicated on the same
    behavior as his false arrest, false imprisonment, and abuse of process claims.  Mr. Vargas is entitled to
18  recover for emotional distress on his false arrest and false imprisonment claims.  *See, e.g.*, *Gurno v. Town
    of LaConner*, 828 P.2d 49, 55 (Wash. Ct. App. 1992), *opinion corrected* (June 29, 1992).  At oral
19  argument, Mr. Vargas' counsel stated that, if he prevailed on his false arrest claim, Mr. Vargas did not
    oppose the dismissal of his intentional and negligent infliction of emotional distress claims as duplicative.
    The court agrees that Mr. Vargas' allegations of intentional and negligent infliction of emotional distress
20  are subsumed by his false arrest claim, and that Mr. Vargas is not entitled to a double recovery for his
    emotional distress.  *See Lawson v. City of Seattle*, No. C12-1994-MAT, 2014 WL 1593350, at *11 (W.D.
21  Wash. Apr. 21, 2014) (citing *Rice v. Janovich,* 742 P.2d 1230, 1238 (1987) (finding error in jury
    instruction allowing for "possibility of double recovery" on both assault and intentional infliction of
    emotional distress claims predicated on the same conduct)).  For this reason also, summary judgment is
22  appropriate on this claim.

ORDER- 46

1   resulting emotional distress was also intentionally inflicted as a matter of law. Therefore,

2   St. Michelle cannot state a cause of action for the negligent infliction of emotional

3   distress."); *see also Willard v. City of Everett*, No. C12-0014 TSZ, 2013 WL 4759064, at

4   *2 (W.D. Wash. Sept. 4, 2013) ("A plaintiff may not base a claim of negligence on an

5   intentional act, like the use of excessive force."); *Nix v. Bauer*, No. C05-1329Z, 2007 WL

6   686506 at *4 (W.D. Wash. Mar. 1, 2007) ("[A]llegations of intentional conduct cannot

7   support a claim of negligence.") (citing *Bolyes v. Kennewick*, 813 P.2d 178 (Wash. Ct.

8   App. 1991)).

9        Here, Mr.Vargas' negligent infliction of emotional distress claim is predicated on

10  the same intentional actions by United States Border Patrol agents that underlie his false

11  arrest and false imprisonment claims. As such, this claim is not cognizable under

12  Washington law, and summary judgment is appropriate on this claim.[18]  *See St. Michelle*,

13  759 P.2d at 470; *Lawson v. City of Seattle*, 2014 WL 1593350, at *13.

14                          **IV.    CONCLUSION**

15       For the foregoing reasons, the court GRANTS in part and DENIES in part the

16  United States' motion for summary judgment (Dkt. # 34) and GRANTS in part and

17  DENIES in part Mr. Vargas' motion for partial summary judgment (Dkt. # 44). Finally,

18

19

20  [18] Mr. Vargas' negligent infliction of emotional distress claim is predicated on the same behavior as his false arrest, false imprisonment, and abuse of process claims. As previously discussed in Section III.E at n.17, because Mr. Vargas can recover damages for emotional distress on his false arrest claim, his negligent infliction of emotional distress claim is subsumed within that claim and therefore may be dismissed as duplicative. *See Lawson*, 2014 WL 1593350, at *1 (citing *Rice*, 742 P.2d at 1238). For this reason also, summary judgment is appropriate on this claim.

21

22

1    the court STRIKES the redacted version of Mr. Vargas' motion for partial summary

2    judgment that was originally filed at Docket No. 35.[19]

3           Dated this 23rd day of March, 2015.

4

5

6           _____

7           JAMES L. ROBART
            United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21    _____

22         [19] In light of the fact that an unredacted version of the same motion has now been filed at Docket
      No. 44, the previous version is now moot.

ORDER- 48